1  IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF ILLINOIS
2  EASTERN DIVISION

3

   UNITED STATES OF AMERICA,          )
4                                      )
                   Plaintiff,          )
5                                      )
             vs.                       ) No. 14 CR 564
6                                      )
   MOHAMMED HAMZAH KHAN,               ) Chicago, Illinois
7                                      ) November 3, 2014
                   Defendant.          ) 10:00 a.m.
8

9       TRANSCRIPT OF PROCEEDINGS - Detention Hearing

10          BEFORE THE HONORABLE SUSAN E. COX

11

   APPEARANCES:
12

   For the Plaintiff:  HON. ZACHARY T. FARDON
13                      United States Attorney
                        BY:  R. MATTHEW HILLER
14                           MS. ANGEL KRULL
                             MR. SEAN K. DRISCOLL
15                      219 South Dearborn Street, Suite 500
                        Chicago, Illinois 60604
16                      (312) 697-4088

17

   For the Defendant:  DURKIN & ROBERTS
18                      BY:  MR. THOMAS A. DURKIN
                             MR. JOSHUA G. HERMAN
19                      2446 North Clark Street
                        Chicago, Illinois 60614
20                      (312) 913-9300

21

22

23 Official Court Reporter:  NANCY L. BISTANY, CSR, RPR, FCRR
                            219 South Dearborn Street, Room 1706
24                          Chicago, Illinois 60604
                            (312) 435-7626
25                          nancy_bistany@ilnd.uscourts.gov

```
 1   APPEARANCES:  (Continued)

 2   For Minor 1:        LAW OFFICE OF MARLO P. CADEDDU, P.C.
                         BY:  MS. MARLO P. CADEDDU
 3                       3232 McKinney Avenue, Suite 700
                         Dallas, Texas 75204
 4                       (214) 220-9000

 5
     For Minor 2:        MR. MICHAEL B. NASH
 6                       53 West Jackson Boulevard, Suite 615
                         Chicago, Illinois 60604
 7                       (312) 236-8788

 8
     Also Present:       MR. MOHAMMED HAMZAH KHAN
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      (Proceedings in open court.)

2           THE COURT:  Good morning, everyone.

3           THE CLERK:  Case No. 14 CR 564, USA versus Khan.

4           MR. HILLER:  Good morning, your Honor.

5           Matt Hiller, Angel Krull, and Sean Driscoll on behalf

6    of the United States.

7           THE COURT:  Good morning to all of you.

8           MR. DURKIN:  Good morning, Judge.

9           Tom Durkin and Joshua Herman on behalf of Mr. Khan

10   who is not here yet.  He's in the lockup.

11          He's just entering the courtroom now.

12          THE COURT:  Good morning to you.

13          Good morning to you, Mr. Khan.

14          THE DEFENDANT:  Good morning.

15          MR. DURKIN:  And, Judge, at counsel table with us is

16   Marlo Cadeddu, who is here to represent any interests of

17   Minor 1 should that become an issue.  I don't think it will be,

18   but she's here.

19          THE COURT:  Good morning.

20          MR. DURKIN:  As is Mr. Michael Nash for Minor 2.

21          THE COURT:  Good morning, Mr. Nash.

22          MR. NASH:  Good morning, Judge.

23          MR. DURKIN:  And we have Associate Robin Waters.

24          THE COURT:  Good morning.

25          MS. WATERS:  Good morning.

1          MR. DURKIN:  And Law Clerk Daniel Crowley.

2          THE COURT:  Good morning.

3          A couple of things before we begin.  I want to just

4   state on the record that I received a letter from Mr. Durkin, I

5   believe, on Thursday stating that the defendant, Mr. Khan,

6   would be waiving his right to a preliminary hearing on the

7   complaint in this case.

8          And, Mr. Khan, I just wanted to make sure in open

9   court that that was the case.

10          THE DEFENDANT:  Yes.

11          THE COURT:  Is that the case?

12          THE DEFENDANT:  Yes.

13          THE COURT:  Okay.  So I will enter a finding of

14   probable cause on the complaint, and we will not have a

15   preliminary hearing.

16          The other thing is that --

17          MR. DURKIN:  So it's clear, Judge, we did that in

18   exchange for early discovery.

19          THE COURT:  All right.

20          The other thing I wanted to state on the record is

21   that this morning I received from the defense a number of

22   exhibits for the hearing as well as from the government, and I

23   just wanted to make sure everyone was apprised of that.  I do

24   have them.

25          I'm ready to begin if you are.

1          MR. HILLER:  We are, Judge.

2          MR. DURKIN:  As we are, Judge.  Did that last

3    exhibit --

4          THE COURT:  Yes, it did.

5          MR. DURKIN:  It did?

6          THE COURT:  Yes, it was emailed to my law clerk, and

7    we do have it.

8          MR. DURKIN:  Okay.  Good.  Sorry about that.

9          THE COURT:  That's all right.

10          How do you wish to proceed, Mr. Hiller?

11          MR. HILLER:  Judge, we're prepared to proceed.  We're

12    going to proceed by proffer to the Court.

13          THE COURT:  All right.  And you're okay with that,

14    Mr. Durkin?

15          MR. DURKIN:  I -- yes, that's fine.

16          THE COURT:  All right.  Well, then since this is

17    going to, I would imagine, take some time, it might be more

18    comfortable if everybody could sit down.  Other than whoever is

19    presenting the information, you need to stand, but the rest of

20    you can --

21          MR. HILLER:  Yes.

22          MR. DURKIN:  I don't know technically whether it

23    matters, but I think at least I would want to begin with the

24    record being clear that we received a pretrial service report

25    that was dated October 8, I believe.  So it's of a fax stamp of

```
1    October 8 --
2                THE COURT:  That's been made clear abundantly, I
3    think, in previous hearings.
4                MR. DURKIN:  Right.
5                THE COURT:  I didn't receive a subsequent report.
6    Are you speaking about the one that --
7                MR. DURKIN:  Yes.
8                THE COURT:  Yes, I have that.
9                MR. DURKIN:  That does recommend release.
10               THE COURT:  So you've said.
11               MR. DURKIN:  Okay.  So the Court --
12               THE COURT:  I think that's been made very clear,
13   Mr. Durkin.  All right.
14               MR. DURKIN:  Okay.  I just wanted to make sure.
15               THE COURT:  And I take it, Mr. Hiller, the
16   government's position is that you are seeking detention on both
17   the grounds that the defendant presents a danger to the
18   community as well as a flight risk?
19               MR. HILLER:  That's correct, your Honor.
20               THE COURT:  All right.  Thank you.
21               MR. HILLER:  Thank you.
22               Judge, on October 4, 2014, FBI agents prevented
23   Defendant Mohammed Hamzah Khan and his 17- and 16-year-old
24   siblings from traveling to Syria and joining the ranks of the
25   barbaric Islamic State of Iraq and the Levant.  The Islamic
```

State of Iraq and the Levant, known as ISIL, is an organization that has called for attacks against the United States and has already cowardly beheaded journalists and aide workers and has slaughtered thousands of Muslims and those who stand in its way.

On October 4th, the defendant in his own words and actions had rejected Western society, abandoned his parents, abandoned his community, and abandoned his country by trying to travel to Syria to join ISIL. The defendant abandoned the very same family and the very same society that he now asks this Court to release him to.

While the FBI physically prevented the defendant from joining ISIL, there is no basis for this Court or the government to conclude that the defendant's desire and, more importantly, his self-proclaimed religious obligation to join the Islamic State, as ISIL now calls itself, has been stopped.

Judge, in accordance with the rebuttable presumption and looking at the factors under 3142(g), there is no condition or combination of conditions that will protect the safety of the community from the defendant and his intent of joining ISIL. And there are no conditions or combination of conditions that will ensure he will abide by the orders of a Court that's jurisdiction is over a society he rejects.

First, the rebuttable presumption applies. This is a federal crime of terrorism. Not withstanding that rebuttable

1   presumption, your Honor, this Court should still find the

2   government meets its burdens for pretrial detention through an

3   analysis of those 3142(g) factors.  Particularly, Judge, we

4   think the two controlling factors in this case are the nature

5   and circumstances of the offense, including the fact that this

6   is a federal crime of terrorism and, two, the nature and

7   seriousness of the danger to the community that would be posed

8   by the defendant's release.

9          Now, to start with that 3142(g) analysis, your Honor,

10  I believe there's some background -- necessary background on

11  ISIL.

12         First, ISIL is a designated foreign terrorist

13  organization.  On May 15th of this year, the Secretary of State

14  of the United States amended the designation of the Al-Qaeda in

15  Iraq as a foreign terrorist organization to add ISIL as its

16  primary name.  ISIL is also commonly referred to as "ISIS" and

17  "Islamic State."

18         On June 29th of this year, Abu Bakr al-Baghdadi, the

19  leader of ISIL, announced that ISIL would be known as the

20  Islamic State, and it had established a caliphate.

21         And third, as noted in the complaint affidavit, has

22  been well established in recent media reporting, foreign

23  nationals are traveling to Syria and Iraq to join ISIL, and

24  many are transiting through Turkey to get to Syria.

25         Your Honor, it is the actions and the statements of

1    the defendant and his siblings that establish dangerousness.

2    More specifically, it was the planning, the attempted travel,

3    and it's their own articulations of their beliefs and desires.

4    It is the defendant who planned and coordinated the logistics

5    of the trip.

6            MR. DURKIN:  Judge, for what it's worth -- and I

7    don't mean to interrupt; I'll try not to interrupt -- but I

8    want to interpose a First Amendment objection to this argument.

9            THE COURT:  This is a proffer.

10           MR. DURKIN:  I understand.

11           THE COURT:  You know, Mr. Durkin, you'll have ample

12   opportunity to address each and every one of the government's

13   arguments when --

14           MR. DURKIN:  I understand.

15           THE COURT:  -- you have your chance.  Okay?  Thanks.

16           MR. HILLER:  Thank you, Judge.

17           THE COURT:  Proceed.

18           MR. HILLER:  It is the defendant who planned and

19   coordinated the logistics of this trip, and that is an

20   important factor for this Court to consider, as the defendant

21   tried to take his high-school-aged siblings halfway around the

22   world to a war zone.

23           Let's talk about the travel planning for a few

24   minutes.  On or about September 26, 2014, the defendant bought

25   three round-trip airline tickets for himself, a 17-year-old

1    sibling who we'll refer to Minor 1, and a 16-year-old sibling

2    who we'll refer to as Minor 2 to travel to Istanbul, Turkey.

3           As the government will establish, this was a trip or,

4    better stated, a permanent move for the three siblings to carry

5    out a mission to join ISIL with the hopes of violent jihad.

6           The airline tickets, your Honor, cost $2,679, and as

7    demonstrated within the government's evidence, this was not a

8    spur-of-the-moment trip but, rather, a carefully calculated

9    plan to abandon their family, to abandon their community, and

10    abandon their country and join a foreign terrorist

11    organization.

12           How did a 19-year-old student pay $2,679 for these

13    tickets?  He got a job.  He got a job for the purpose of

14    getting these tickets.  He saved his money for a couple of

15    months, and on September 26th, he purchased those three

16    round-trip tickets.  He also planned the trip and coordinated

17    the logistics to get himself and his minor siblings to Syria.

18           Now, Judge, we proffer Government Exhibit 1.  The

19    Government Exhibit 1 is an email that was recovered from the

20    defendant's phone which was seized by agents at the airport.

21    The email was in the sent file for the email account

22    Hamzah.Khan6@gmail.com.  As the defendant notes in the email,

23    he applied for his minor siblings' passport.  The purpose of

24    this email appears to be to determine why one of his minor

25    sibling's passports had not yet been issued even though his

1  passport and the other minor sibling's passports had been
2  issued.

3         Also recovered from the Hamzah.Khan6@gmail account on
4  defendant's phones were emails showing that the defendant
5  applied for and paid for visas to travel to Turkey.  And those
6  are submitted as Government Exhibit 2.

7         Although the minors' names appear at the top of the
8  emails, page 2 and page 3 of that exhibit, the email address
9  behind those names was Hamzah.Khan6@gmail.com.

10         Now the actions, the actions of traveling to O'Hare.
11 On October 4th, defendant, along with Minor 1 and Minor 2,
12 arrived at O'Hare, checked in for an Austrian Airlines flight
13 to Vienna where they would fly on October 5th to Istanbul,
14 Turkey.  The defendant's boarding pass and passport which were
15 recovered from the defendant at the airport are submitted as
16 Government Exhibit 3.

17         Your Honor, the government omitted Minor 1 and
18 Minor 2's travel documents that were also seized from them
19 because those would obviously identify them publicly.  Of
20 course, we can make those available to the Court.

21         THE COURT:  That won't be necessary.

22         MR. HILLER:  Thank you, Judge.

23         The fact that the defendant got a job, he saved his
24 money, he paid $2,679 for tickets, he went to the airport, and
25 he tried to board a flight to travel to a war zone are critical

1    facts that separate this defendant from a misguided teenager

2    who boasts of threats and inflammatory rhetoric that neither

3    has the capability nor the true desire to carry out those

4    threats or rhetoric.

5           The difference here is that the defendant acted.  He

6    and his siblings not only had barbaric rhetoric, which this

7    Court will see, defendant tried to carry that rhetoric out, and

8    he also tried to make that happen for his high-school-aged

9    minor siblings.

10          Your Honor, the defendant and his minor siblings

11   arrived at O'Hare in the afternoon on October 4th.  They passed

12   through security.  They walked towards their departure gate,

13   and on their way to the departure gate, they were approached by

14   officers of the United States Department of Customs and Border

15   Protection, and those officers conducted an interview.

16          The siblings lied to the officers.  Their stories

17   were inconsistent with each other and contradicted their

18   parents.  When the siblings were speaking with those officers,

19   what they did not realize was that a team of federal agents

20   were searching their residence and interviewing their

21   parents -- searching their residence and interviewing their

22   parents.

23          Now, during that brief interview with the customs and

24   border protection officers, the defendant claimed that they

25   were traveling to Istanbul but that they did not have any

1    reservations.  When asked if they were going to meet anyone,

2    the defendant responded they were going to the Blue Mosque and

3    Topkapi.

4            Minor 1, however, claimed that they were traveling to

5    Istanbul and would be staying with the defendant's friend.

6    Minor 1 did not know the name of the friend or where they would

7    be staying.  Minor 1 also claimed that their parents knew they

8    were traveling on vacation.

9            Minor 2 came up with another explanation and claimed

10   that they were traveling to Istanbul, and they were going to

11   see their cousins.  Minor 2 also claimed that their parents

12   were aware of their travel.

13           As I mentioned, as that was occurring, federal agents

14   were searching the family residence in Bolingbrook.

15           Now, during the course of that search, agents spoke

16   with the defendant's parents.  The defendant's father told

17   agents that he was unaware that his children had planned to

18   depart the United States for Turkey.  Similarly, the

19   defendant's mother said she was not aware of the travel.  And,

20   in fact, she believed that Minor 1 was asleep in the home.  In

21   fact, I believe the defendant's mother took the agents to

22   Minor 1's bedroom to find out that she was not there.

23           During the search of the residence, agents found

24   letters that each of the siblings had appeared to have left for

25   the parents.  Agents also recovered numerous writings from

1    notebooks and textbooks.

2           And, your Honor, although the investigation continues

3    as to the specific attribution of some of those writings and

4    letters, those writings and letters collectively establish

5    their intent to join ISIL and carry out the violent jihad.  And

6    we'll go through those letters, where they were found, and how

7    the Court can connect them to these siblings.

8           At this point, your Honor, the government will

9    proffer a series of these letters and writings, and they will

10   establish three things; that these individuals intended to

11   travel to Syria and were not sight-seeing in Istanbul; two,

12   once they were in Syria, they intended to join ISIL; and three,

13   they sought violent jihad.

14          To start, the government will submit the letters left

15   by the defendant and his minor siblings.  Notably, each of the

16   siblings begged their parents not to contact law enforcement.

17   They knew what they were doing was illegal.  They knew -- they

18   were not looking to observant Muslims who were seeking a holier

19   land.  They were seeking to provide material support to a

20   foreign terrorist organization.

21          The first letter, your Honor, is Government Exhibit

22   4, and this is the letter of Defendant Mohammed Hamzah Khan.

23   Government Exhibit 4 is signed "Hamzah."  And I'll just

24   highlight a few of the statements the defendant makes in the

25   letter just to save time.

1    The defendant starts off the letter in capital

2  letters.  "First and foremost, please make sure to not tell the

3  authorities.  For if this were to happen, it will jeopardize

4  not only the safety of us but our family as well."

5    Nine lines up from the bottom of the first page, your

6  Honor, the defendant describes his obligation to the Islamic

7  State, the new name for ISIL, and his inability to stay behind

8  while his brothers are being killed.

9    Defendant wrote:  "Secondly, an Islamic State has

10  been established, and it is thus obligatory upon every

11  able-bodied male and female to migrate there.  I cannot live

12  under a law which I'm afraid to speak my beliefs, and I want to

13  be ruled by the Sham, the best law for all mankind.  Tell me,

14  if we were truly free, why do we have to live in fear?  True,

15  we can practice other aspects of our Din" -- which I believe is

16  a reference to religion -- "but we can't openly speak about

17  jihad.  Nonetheless, me living in comfort with my family while

18  my other family are getting killed is plain selfish of me."

19    In short, the defendant and his other siblings will

20  not sit idly by while ISIL, in their view, is attacked by the

21  United States and a coalition of nations.

22    On page 2, again nine lines up from the bottom, the

23  defendant further admits that he's going to the battlefield.

24  "I extend an invitation to my family to join me in the Islamic

25  State.  True, it is getting bombed, but let us not forget that

1    we did not come to this world for comfort."  And as a final

2    note, it is clear throughout this writing that the defendant

3    rejects Western society.

4           Next, your Honor, we submit Government Exhibit 5.  If

5    I didn't say so, Government Exhibit 4 was found in the family

6    residence, your Honor.

7           Government Exhibit 5 --

8           THE COURT:  Do you know where it was found,

9    Mr. Hiller?

10          MR. HILLER:  Government Exhibit 4, I believe, was

11   found in his -- the defendant's bedroom.

12          THE COURT:  Thank you.

13          MR. HILLER:  Next we submit Government Exhibit 5.

14   Government Exhibit 5, also found in the residence and believed

15   to be the letter of Minor 2, it is unsigned.  Minor 2 shares a

16   bedroom with the defendant, but this letter was found actually

17   in the bedroom of Minor 1.  It's an unsigned letter that

18   appears to be Minor 2's.  The letter again implored the

19   siblings' parents not to contact the authorities.  "Please do

20   not call the police.  They will arrest Abu" --

21          THE COURT:  Where are you reading from, Mr. Hiller?

22          MR. HILLER:  This is right at the top.  Oh, I'm

23   sorry.  In the note all the way at the top, it's kind of

24   blocked off in a box.

25          THE COURT:  Oh, I see.  I see.  Okay.

1    MR. HILLER:  "Please do not call the police.  They

2    will" scratched out "will arrest Abu and harass the whole

3    family."

4         THE COURT:  Okay.

5         MR. HILLER:  Minor 2 later added:  "Please, if you

6    love us, Abu" -- "love us and Abu, don't call the police."

7         Government Exhibit 5 also describes the obligation of

8    jihad.  And, your Honor, I believe this is on page 4 in the

9    middle of the page.  It's actually -- it starts at the top and

10   continues through the middle of the page.

11        This is what appears to be Minor 2 writing about

12   their obligation of jihad.  "And even if we stop looking at the

13   news, it doesn't mean the children stop getting killed.  How

14   easily would it be for us to stay here, get an easy job, and

15   stay in comfort and false happiness, but that is not the

16   lifestyle of the believer.  Our duty lies in jihad.  The people

17   and 'scholars' of America and other places who deny our fard

18   obligation of jihad are diseased with hypocrisy."

19        He clearly appears to be attacking those within the

20   Muslim community who are arguing against the violent jihad.

21   These siblings believe they are religiously obliged to support

22   violent jihad.  This is a far cry from a misguided youth who is

23   overzealous in his religious belief.

24        Minor 1 left two letters.  First we'll submit

25   Government Exhibit 6.  Again, Minor 1 begged the siblings'

1  parents not to contact the authorities.  Minor 1 was also more

2  discrete -- more direct, excuse me, with their faith.  Minor 1

3  wrote:  "My heart is crying with the thought I left you and I

4  will probably never see you again in this dunya" or this world.

5  She later continues:  "I could have led a comfortable life

6  where I was.  We could've all grown up and lived together and

7  enjoyed each other's company until we died.  Death is

8  inevitable, and all of the times we enjoyed will not matter as

9  we lay on our death beds.  Death is an appointment, and we

10  cannot delay or postpone, and what we did to prepare for our

11  death is what will matter."

12          Notably, as we'll discuss in a few moments, Minor 1's

13  Twitter's handle and email address are -- begin with

14  "deathisvnear."

15          Next we submit the second letter of Minor 1 on page 1

16  of Government Exhibit 7.

17          THE COURT:  Can I interrupt you again, Mr. Hiller?

18          MR. HILLER:  Absolutely, your Honor.

19          THE COURT:  My copy of Government Exhibit 7 is

20  virtually unreadable.  If you could maybe -- is there a better

21  copy for me to look at?

22          MR. HILLER:  Absolutely, your Honor.

23          THE COURT:  Other than "Dear Mama and Abu," I can't

24  read another thing on the letter.

25          MR. HILLER:  And unfortunately, a lot of the writing,

1    it was in pencil and on composition notebook paper.

2          (Brief pause.)

3                MR. HILLER:  The evidence tape works.

4                Judge, we brought a lot of the original evidence

5    here.  If there's anything you would like, just let us know.

6                THE COURT:  I just noticed this is just very hard to

7    read.  I'll give it back to you, rest assured.

8          (Brief pause.)

9                THE COURT:  Thank you, Mr. Hiller.  Much better.

10               MR. HILLER:  Sorry for that, Judge.

11               THE COURT:  No problem.

12               MR. HILLER:  So on page 1 of Government Exhibit,

13   Minor 1 again implored the parents not to contact the

14   authorities.  Minor wrote:  "Do not, do not, and do not call

15   the cops and come looking for us.  If you do this, we are all

16   done for.  They will arrest Abu, and they will arrest us if

17   they catch us.  And they can take us all away from you.

18   Wallah, this will happen.  What can you expect?  They are our

19   enemies.  As you are reading this, they are probably already

20   after us.  If you call them, it will confirm it for them, and

21   they will definitely catch us.  After that, we don't know what

22   will happen.  They will put us in jail."

23               From these letters, it is clear that the defendant

24   and his siblings viewed the United States as their enemy.  Yet

25   now defendant appears to claim he is willing to abide by an

1    order of the United States District Court.

2            Ms. Krull just reminded me that I should say that we

3    just opened Evidence Bag Item No. 41 to take this letter out to

4    present to the Court.  We'll obviously re-seal that after the

5    Court is finished.

6            THE COURT:  Yes, I'll give it back to you now.

7            MR. HILLER:  Thank you, Judge.

8            Judge, these writings also establish that the

9    defendant and his siblings reveal an impressive plan to get to

10   Syria.  First, according to the defendant's letter marked as

11   Government Exhibit 4, they were heading to Shaam.  And Shaam is

12   a reference to Syria.

13           But the more telling piece of evidence, your Honor,

14   is Government Exhibit 8.  Government Exhibit 8 is one page from

15   a notebook which was found in a common area of the house, and

16   that notebook included the defendant's name and Minor 1's name.

17           Government Exhibit 8 was the sketch or blueprint for

18   the plan.  The top half of the page is the plan to get the

19   necessary money.  The top half also has a sketch actually as to

20   possibly one route of travel.  The bottom half starts with an

21   analysis of the cost and the logistics.

22           And I'll walk through this letter.

23           THE COURT:  Okay.

24           MR. HILLER:  Starting at the top, "No. 1, $250 from

25   Sunday S.  Two, X money from work warehouse."  The defendant

1    obtained a job at a big box or warehouse-type store this
2    summer.  X money from an illegible source.  And four, credit
3    card.  The defendant had an account at a bank, and either had a
4    debit or a credit card associated with that account, and that
5    was the means in which the defendant paid for these airline
6    tickets.

7            Just off to the right of that, your Honor, you see a
8    rough sketch of what appears to be the United States.

9            THE COURT:  Yes.

10           MR. HILLER:  A dot in roughly where Chicago would be
11   located, a line straight up to what appears to be written
12   "Toronto" and again roughly where Toronto would be, and then a
13   line extending -- a curved line extending over to what appears
14   to be a rough sketch of Turkey.  And it stops roughly where
15   Istanbul would be.

16           And then there's a series of lines -- it's very
17   difficult to read writing -- that appears to be a journey
18   through Turkey and then crossing what would be the Syria or
19   Iraq border.

20           Below, your Honor, we'll define exactly what was
21   meant there.

22           Now, so heading down into the cost and logistic
23   section.  First, $4,000 ticket to Istanbul.  The defendant
24   overbudgeted.  Second, supplies via credit card.  Three, cash
25   for hotel in Istanbul, $70.  Bus ride to what appears to be

1    Eskisehir.  I believe it's spelled wrong here, but Eskisehir is
2    a city in Turkey.  And actually, it possibly is that word
3    that's written just south and to the east of Istanbul in the
4    rough drawing above.

5           And then this is where that journey from Istanbul to
6    Syria is explained.  Again, the misspelling of what appears to
7    be Eskisehir and then an arrow to Konya and then an arrow to
8    Adana.  This would be, if that defendant was following that
9    route, a route from Istanbul heading south and east, getting
10   closer and closer to the Syrian border.

11          Next, item 6, "get in touch with Abu."  And then
12   there's Arabic writing.  It says:  "Get in touch with Abu
13   'Ukasha Al-Amriki, Qa'qa, or Um-Harith."  It's not clear.  It's
14   very difficult to read.  Abu 'Ukasha Al-Amriki appears to be
15   the defendant.  The defendant used a Twitter handle or a
16   Twitter name of Abu 'Ukasha.  "Al-Amriki" means the American.

17          Abu Qa'qa or Um-Harith appear to be individuals that
18   the defendant is to get in touch with.  In the order of the
19   list, it would be once in Turkey.

20          And then 7, "Most likely go to Urfa."  Urfa is a very
21   southern and eastern city in Turkey that's directly north of
22   Al-Raqqah.  And Al-Raqqah is the stronghold for ISIL.

23          Then further qualified, there's Arabic writing to the
24   left of that triangle-type doodle.  "Al-Raqqah province in the
25   Islamic State in Iraq and the Levant.  Abu 'Ukasha Al-Amriki."

1   Again, the defendant appearing to refer to himself.

2              This appears to be a self-proclaimed mujahideen name.

3   Of course, he's referring to himself on Twitter as Abu 'Ukasha,

4   but a teenager just residing in Bolingbrook does not need to

5   refer to himself as "the American."  However, a teenager

6   fighting with ISIL, it's a badge of honor to call himself "the

7   American."

8              And then below that, for the Islamic State in Iraq

9   and the Levant.

10             Now, once in Syria, the defendant and his siblings

11  were going to join ISIL and engage in violent jihad.  And how

12  can the Court determine that?  Again, through more writings of

13  the defendant and his siblings.

14             First, we'd ask the Court to turn to Government

15  Exhibit 9.  Government Exhibit 9 is five pages taken from a

16  notebook found in a common area of the house and also included

17  the defendant's name and Minor 1's name.

18             And if you start with page 1, the Court can see

19  Arabic writing on just notebook paper.  And according to FBI --

20  and all of the translations that I have proffered to the Court

21  are from FBI linguists fluent in Arabic, your Honor.  And

22  actually, one is present here today if the Court has any

23  follow-up questions.

24             On page 1, Government Exhibit 9, it's written:

25  "Islamic State in Iraq and the Levant.  Here to stay.  We are

1  the lions of the war.  My nation the dawn has emerged."

2          The reference to lions is interesting, because as the

3  Court will see in a minute, the defendant also refers to

4  himself as Asadullah, and Asadullah being the lions of Allah.

5  And also on that same Twitter page in which the defendant's

6  name is listed as Abu 'Ukasha, the actual Twitter handle, the

7  "at" symbol is "@lionofthedesert."

8          Page 2 of Government Exhibit 9 shows an artistic

9  drawing of the name Hamzah Khan.

10          Page 3 includes some Arabic writing with some

11  religious statements and then also drawings of the ISIL flag

12  and another designated foreign terrorist organization operated

13  in Syria, Al-Nusra.

14          Page 4, and here the Court can see the definition of

15  jihad that the defendant and his siblings referenced in their

16  letters.  At the top written in Arabic, it says, "Come to

17  Jihad!!!"  And then as the Court sees, there's a drawing of the

18  ISIL flag, the drawing of what appears to be a mujahideen

19  fighter with an assault rifle, the drawing of the jeep carrying

20  what appears to be another mujahideen fighter holding up an

21  assault rifle with the ISIL flag flying off the jeep.

22          At the bottom, it is finished:  "Come to Jihad.  Come

23  to salvation."

24          And that was the purpose of this trip, go to jihad to

25  get salvation.

1    Page 5, another piece from that notebook.  And you
2    can see what appears to be school writing at the top of that
3    notebook, and then written in Arabic below that school writing:
4    "Jihad, monotheism in Qur'an.  We are the lions of the war.
5    The commander of the rights under Abu Bakr al-Baghdadi" -- the
6    leader of ISIL -- "Abu-Maria Al-Hariri," then we see a picture
7    of a truck, and then under the picture of a truck, the
8    commander of the ranks.

9    Then moving to Government Exhibit 10, Government
10   Exhibit 10 is an outdated academic calendar, but it includes
11   more recent writings and drawings.

12   If the Court turns to page 2 of the calendar, the
13   name in the weekly calendar is "Mohammed Asadullah Hamzah
14   Khan," again, Asadullah, the lion of Allah.

15   Page 3, a drawing of the ISIL flag, and then directly
16   under that drawing is the writing "The Islamic State of Iraq
17   and the Levant."

18   And, again, these are just excerpts from that
19   calendar, your Honor.  This is not, obviously, the entirety of
20   that calendar.

21   THE COURT:  Understood.

22   MR. HILLER:  Page 4 listed on Friday, the 10th of
23   October, "Amir Abu Bakr al-Baghdadi."

24   Page 5 spread out over four dates, it looks like, at
25   some point in November, "The Islamic State of Iraq and the

1    Levant."

2         Page 6 and a telling symbol for what the defendant

3    and his siblings' plans were:  "Killing a Nusairi, liar and

4    dog, pig and monkey."  Your Honor, "Nusairi" is a pejorative,

5    slang term for a sect of Shia Islam that is very prevalent in

6    Syria.  And that's exactly what ISIL wants to do, is kill Shia

7    Muslims.

8         "The Islamic State" -- I'm sorry, next page, page 7,

9    "The Islamic State of Iraq and the Levant" written across

10   calendar entries.

11        Next, your Honor, the government submits Government

12   Exhibit 11.  Your Honor, Government Exhibit 11 is a chart

13   created by the government after a forensic analysis of the

14   defendant's cell phone that was recovered from him at the

15   airport.

16        And through this forensic analysis, the analysts were

17   able to determine that the phone accessed the website

18   "islamqa.info."  And on that website, which appears to be a

19   website in which individuals can access it for research or

20   information purposes on different beliefs within the Muslim

21   faith, someone using the defendant's phone accessed that

22   website and researched "jihad fard al ayn," the obligation of

23   jihad, suicide bombings, suicide, hijra.  And "hijra," your

24   Honor, meaning migration in Arabic but also frequently used in

25   this context to mean migration for the purposes of being a

1    foreign fighter, which frequently means foreign nationals who

2    are traveling into Syria are using the term "hijra" to mean the

3    migration to the Islamic State for the purposes of jihad.

4              Moving on to Government Exhibit 12, Government

5    Exhibit 12 is a small excerpt from another composition book

6    found in the home.  It was located in Minor 1's bedroom, and

7    the Court can see we redacted some information at the top of

8    the first page because an alias for Minor 1 is listed there.

9              The writing in Government Exhibit 12, this portion,

10   this excerpt appears to be a statement prepared by Minor 1.

11   And then as the Court can see, this is a terrible copy.  And we

12   have reworked this copy, and this is about the best we can get

13   at this point in time.  But we did type up, and I believe the

14   Court has a typed page --

15             THE COURT:  I do.

16             MR. HILLER:  -- behind that, and we included that in.

17   And this is our best effort to review that and transcribe this.

18   I'll read a portion of it.

19             The statement reads:  "My name is blank, and I want

20   to go for jihad.  The men of my time are cowards like women,

21   who only sit around and gossip like old lions.  They are lazy

22   and hopeless."

23             I'll skip down a few sentences.  Again, it starts:

24   "The men are embarrassing to look at.  When talk of jihad comes

25   up, they turn their faces away or look down and avoid your eyes

1   or attack you and say that you are not a woman.  They say 'the
2   time has not come yet.  Our elders are not doing it.  If the
3   scholars have not said it, who are you to?  It is pointless.
4   Islam does not preach violence,' and so on.  My ears bleed with
5   such talk, and I swear I can silence them in everything they
6   say, but they do not want to hear it.  They do not want to
7   believe.  And the women, their grief for this world blinds them
8   and has made them vicious.  When talk of jihad comes up, they
9   lash out at you, mock you, and ridicule what the best people on
10  the face of the earth love and carried out with passion flaming
11  their hearts.  Will they say the same when it is their children
12  whose sculls are being crushed and their husbands who are being
13  tortured, their fathers who are slaughtered, and their mothers
14  who are raped?

15          "I swear by the one who holds my soul in his hands, I
16  will not give this up even if the entire world turns against
17  me."  Echoing some of the exact same thoughts the Court saw in
18  the siblings' letters to the parents and that they are no
19  longer welcome in Western society because of their beliefs for
20  violent jihad.

21          Now turning the Court's attention to Government
22  Exhibit 13, Government Exhibit 13 is from another notebook that
23  contains -- this is just a two-page excerpt from another
24  notebook found within the residence.

25          The Court can see what appears to be some sort of

1  math homework at the top and then Arabic writing.  And within

2  that Arabic writing, the author writes:  "Afghanistan,

3  mujahideen.  Jihad for the sake of Allah.  Smile because jihad

4  is at hand."

5  Later it continues:  "Go to the battles, young men.

6  Kill, kill, kill the infidels with our jihad, the Islamic State

7  in Iraq and the Levant."

8  Also within that Arabic writing is religious text and

9  a description of other foreign terrorist organizations or at

10  least one other foreign terrorist organization.

11  Government Exhibit 14, your Honor, the government

12  submits.  Government Exhibit 14 is a screen capture taken from

13  a video that was recovered -- I'm going too fast.

14  Page 2 of Government Exhibit 13 is a -- appears to be

15  a sketch of a jihadi fighter with an assault rifle on his back

16  standing in front of the flag of ISIL.

17  Now I'm moving to 14.  Government Exhibit 14 is a

18  screen capture from an ISIL propaganda video found on a phone

19  recovered from Minor 2 at the airport.

20  Now turning to Government Exhibit 15, your Honor,

21  Government Exhibit 15 reveals the siblings' intent even more

22  clearly.  It is a Qur'an that was found in Minor 2's bedroom,

23  the bedroom that Minor 2 shares with the defendant.

24  Government Exhibit 15 includes a few pages containing

25  handwriting within the Qur'an which was found near Minor 2's

1    bed and has Minor 2's name written inside.  As the Court will
2    see, the copies are completely illegible, but I do want to
3    highlight -- and I have the original for the Court as well.  I
4    do want to highlight just a few of those writings.

5          One, there was a drawing of the ISIL flag and the
6    inscription of the Islamic State of Iraq and the Levant.  Also
7    handwritten within the Qur'an is:  "Oh, Allah, make me one of
8    the migrants, make me one of the mujahideen, and make me one of
9    the martyrs."

10         Also again difficult to read, but there is a life
11   plan.  And within that life plan are, among other things, "file
12   for passport, earn money, go for Hijra, martyrdom or victory."
13   It appears the last one is something "Get in jannah," or
14   heaven.

15         Now moving forward to Government Exhibit 16,
16   Government Exhibit 16 is another page from a notebook recovered
17   from within the residence.  Government Exhibit 16 appears
18   possibly to be some school writing, and then there's an Arabic
19   kind of doodling and writing in the middle right-hand portion
20   of the page.  And that Arabic reads, first at the top Minor 2's
21   name, "one of the martyrs, one of the mujahideen, Allah
22   willing."

23         Moving forward to Government Exhibit 17, Government
24   Exhibit 17 is another page from a notebook recovered from the
25   defendant's bedroom which he shared with Minor 2.  And this is,

1   obviously, notebook paper that includes a drawing of the ISIL

2   flag, a bed, a desk with a lamp or an end table with a lamp and

3   what appears to be an assault rifle and a pistol.

4          At the top it reads:  "This is the State of Islam

5   here to stay," and there's the ISIL flag.  And then the Arabic

6   writing in the middle of the page reads:  "Ranks pledged

7   allegiance to al-Baghdadi," the leader of ISIL.

8          Now on to Government Exhibit 18, which is another

9   page from a notebook found in Minor 1's room that Minor 1

10  shared with another sibling.  And Government Exhibit 18 is an

11  example of the planning that the siblings took to prepare for

12  this trip.

13         It includes what appears to be a packing list or a

14  to-do list before leaving.  And at the top in Arabic, it reads:

15  "Immigration to the Islamic State."  And as the Court sees,

16  there's three columns with very difficult to read Arabic

17  writing over the top of three columns.  One of those columns

18  reads "Umm Bara'," which is a moniker used by Minor 1, and

19  another one is "Abu Khuzaymah," which is another moniker used

20  by the defendant.  And the third one, I believe, is illegible

21  or we have yet been able to determine what that reads at this

22  time.

23         And as the Court can see, it's the to-do list, bags

24  for luggage, passport, phone, sleeping bags, tourist visa,

25  tickets, light food items, letters, schedule taxi driver.

1    Moving forward to Government Exhibit 19, Government
2    Exhibit 19 is again another piece of notebook paper.  And this
3    was recovered from the car that the defendant shared with his
4    father.  In fact, it's the same car that the defendant drove on
5    October 4, 2014, the day of his flight.  The defendant did not
6    take that car to the airport but drove it earlier in the day.

7    The Court can see a series of Arabic writings and
8    sketches, including what appears to be another example of a
9    jihadi fighter carrying an assault rifle, the ISIL flag, the
10   flag of the Al-Nusra front, another designated foreign
11   terrorist organization operating in Syria, and then writing.

12   And at the top, it's written:  "Abu 'Ukasha," again
13   the defendant's online moniker, "Abu 'Ukasha Al-Amriki.
14   Asadullah Mohammed Hamzah Khan."  "Asadullah," the lion of
15   Allah.  "Islamic State in Iraq and the Levant," then a series
16   of what appear to be other foreign terrorist organizations.
17   "Al-Qaeda and the Levant here to stay."

18   And these are just examples of the writings that were
19   taken out of the home and obviously excerpts within those
20   notebooks, your Honor.

21   Now I'd like to move on to a social media account and
22   an example of the siblings' intent.

23   Government Exhibit 20.  Government Exhibit 20 is a
24   screen shot of a tweet posted from the Twitter account Umm
25   Bara' -- and that's U-m-m space B-a-r-a apostrophe -- at

1   deathisvnear, this being the Twitter account of Minor 1.

2          And on February 12, 2014, UmmBara'@deathisvnear

3   tweeted: "Well, look at what my brother made me," with a

4   picture of a handwritten drawing of the ISIL flag with writing

5   on the flag that reads: "The Islamic State in Iraq and the

6   Levant."

7          Also through the same account on May 25, 2014,

8   UmmBara'@deathisvnear tweeted: "Mama, I need Internet to watch

9   Saleel Sawarim, but I can't tell you that," with what appears

10   to be an emoticon of a frowning face.

11     (Discussion was had off the record.)

12          MR. HILLER: That's not on this page. I'm just going

13   to introduce the next set of exhibits. It's just another tweet

14   that I'm proffering for the Court.

15          THE COURT: Okay.

16          MR. HILLER: So on May 25, Minor 1 tweets the need to

17   watch Saleel Sawarim. Saleel Sawarim is a video that we'll

18   talk about in detail.

19          THE COURT: Okay.

20          MR. HILLER: On or about May 28, 2013,

21   UmmBara'@deathisvnear tweeted: "Finally have net! Saleel

22   Sawarim, here I come," with an emoticon of a smiling face.

23   Clearly Minor 1 knew what Minor 1 was about to see.

24          Your Honor, Saleel Sawarim is a video that is

25   approximately an hour in length and purports to document ISIL's

1    activities.  It's a propaganda video.  The video has been
2    posted publicly multiple times.  The Saleel Sawarim video
3    documents ISIL's barbaric terrorism in Iraq and Syria.  The
4    video includes extremely violent footage, accompanied by
5    jihadist songs and ISIL rhetoric.

6         Apparently after viewing the video, Minor 1 tweeted
7    out Minor 1's twisted delight in ISIL's terror.  For example,
8    on or about May 28, 2014, UmmBara'@deathisvnear tweeted:  "The
9    end of Saleel Sawarim" and then an emoticon of a heart and an
10   emoticon of a smiling face.

11        Now, the government submits Government Exhibit 21.
12   And unfortunately, as the Court will see, Government Exhibit 21
13   captures screen shots from the Saleel Sawarim video.  And these
14   screen shots depict gruesome executions, beheadings, and other
15   violent imaginary from that Saleel Sawarim video.  And this is
16   a video that Minor 1 begged or wanted to see.

17        The videos include executions, executions by pistols,
18   small arms to the back of the head in front of the ISIL flag,
19   multiple executions, group executions by pistols to the back of
20   the head with ISIL fighters, sniper shots where they video the
21   person just before the sniper shoots them, and then obviously,
22   the agony as the person falls to the ground.  The ISIL flag is
23   documented throughout the video, and then finally, a beheading.

24        Your Honor, pretrial services recommended to this
25   Court that there are a set of conditions that this Court can

1    impose that would reasonably assure the defendant's appearance

2    and the safety of the community.  And pretrial services, when

3    they prepared that report, obviously are not able to consider a

4    number of factors.  And those factors include the presumption

5    they were not able or allowed to by their -- their governing

6    regulations to consider the evidence we presented to the Court

7    today.  They were not able to consider the role of the minors

8    or the fact that the defendant took his high-school-aged

9    siblings or attempted to take these high-school-aged siblings

10   with him on this move to a war zone.

11           And as a result, we think in this situation, the

12   pretrial services report should be given little credit because

13   it doesn't take into the facts that really establish

14   dangerousness and risk of flight.  And that is of no fault of

15   the pretrial services officer or that office.

16           Your Honor, in conclusion, we'd ask this Court to

17   find the defendant is a danger to the community.  He was

18   stopped against his will from joining ISIL after a

19   sophisticated but discrete plan to travel halfway around the

20   world with his minor siblings.

21           He was attempting to join an organization that has

22   called for attacks against the United States and has already

23   killed U.S. citizens and is dedicated to genocide.

24           He also rejects the society within which he will

25   reside if this Court is to release him.  While he may have been

1  physically prevented from joining ISIL and becoming a

2  mujahideen fighter, his desire and purported obligation to ISIL

3  has been not been stopped.

4        Simply, there are no conditions or combination of

5  conditions that can protect the safety of the community from

6  the defendant and his intent on leaving Western society and

7  joining ISIL.

8        Your Honor, the defendant is also a danger to those

9  within his own home or any home that this Court would release

10 him to.  First, the defendant paid for and coordinated the

11 travel for two high-school-aged minors to go to a war zone.

12       Secondly, he planned this elaborate scheme and

13 international trip while he and his siblings were under the

14 supervision of their parents residing in the family home and

15 without the parents' knowledge.

16       Third, at a minimum, defendant and his siblings have

17 been radicalized.  The drawings and writings establish the

18 defendant and his siblings not only have a desire but a

19 self-described obligation to join and support a designated

20 foreign terrorist organization.  How these teenagers are

21 radicalized is presently unknown, but the Court can conclude

22 that these siblings were radicalized through the evidence the

23 government has presented.

24       As a result, defendant is not only a danger to his

25 community at large, he is a danger to his younger siblings and

1    any other members of any residence he would be released to.

2         And finally, your Honor -- I've probably said that a

3    couple of times -- but finally, your Honor, according to their

4    writings, the purported moral obligation which led them to

5    leave their family behind and abandon the family home and

6    abandon their home country supersedes any pretrial release

7    order that this Court can fashion.  No court order can be

8    effective to someone who has rejected the society in which the

9    Court presides.

10        Finally, your Honor, this is obviously a serious

11   crime, and the defendant faces a considerable term of

12   imprisonment if convicted.

13        And we're happy to answer any questions the Court

14   has.

15        THE COURT:  None at this time, Mr. Hiller.  Thank

16   you.

17        MR. HILLER:  Thank you, your Honor.

18        THE COURT:  Mr. Durkin.

19        MR. DURKIN:  If I can just have one second, Judge.

20        THE COURT:  Sure.

21     (Brief pause.)

22        MR. DURKIN:  Well, up until today, I was pretty sure

23   we were going around the bend in this country, but today I'm

24   convinced beyond a shadow of a doubt that we've completely gone

25   around the bend.

1          This is -- that presentation was about as absurd a

2     presentation as I've ever seen in an American courtroom.  We're

3     talking about American children, American children.  This whole

4     idea that they renounced their country and everything else is

5     nothing but shear rhetoric and an attempt to do by the criminal

6     justice system the bidding of our geopolitical stance, which is

7     so convoluted that I can't figure it out anymore.

8          We have a group that beheaded two American

9     journalists and pushed the President into bombing it when he

10    clearly did not want to do.  And as a result of that bombing,

11    we now have reaction against our bombing, which was predictable

12    by virtually anybody who was observing this geopolitical

13    madness, that somehow we're going to stop ISIS from beheading

14    people, or whatever, and we're going to somehow strategically

15    bomb ISIS in order to make sure that the Assad is kept at bay.

16         One of the things I found very interesting about this

17    presentation is the fact that they talked about Al-Nusra as a

18    designated global terrorist organization.  They talked about

19    this group ISIS now being designated as a global terrorist

20    organization.  And that's kind of curious, too.

21         And I say this in connection to what I would put

22    under the umbrella of the weight of this case, which is a

23    factor you can consider under 3142, as you know.  This is a

24    hopelessly weak case.  They're not charged with treason,

25    although I had some question about whether that was the

1   government's real position here, whether it was more serious as

2   to whether they dared renounce Western values than get on an

3   airplane.

4          But to put it in perspective for 3142 reasons and not

5   for geopolitics, the weight of the evidence here is weak at

6   best.  They're charged with an attempt of material support.

7   And I trust you've read 3142 more times than I have, but you

8   know that there is a First Amendment exception to 3142 in

9   3142(h) with this provision of personnel.  And provision of

10  personnel is the most -- the weakest and perhaps the most

11  unconstitutional portion of the statute --

12         THE COURT:  But that issue is not before me,

13  Mr. Durkin.

14         MR. DURKIN:  The issue in terms of --

15         THE COURT:  The issue -- the complaint before me has

16  been -- when I signed it, I found there to be probable cause.

17  Your client has acknowledged as much by waiving his preliminary

18  hearing.

19         The issue before me is not whether he's guilty of the

20  crime that he's charged with.  The only issue before me is

21  whether there can be a bond fashioned to reasonably assure the

22  safety of the community and his appearance.

23         MR. DURKIN:  I understand.  But one of the factors

24  you have to take into account is the strength of the case

25  against the defendant.  And I'm simply suggesting, based on

1    3142(h) and based on *Holder*, there are a lot of questions about
2    whether this could possibly be said to constitute an attempt of
3    material support.

4              And if you just bear with me a second, because I
5    think this is an important factor for you to consider.  The
6    government spews a lot of rhetoric around the room about
7    dangerousness and so forth.  But the question is not what ISIS
8    does.  Everybody can concede that ISIS is a bunch of bad dudes,
9    as one of the Pentagon generals said.

10             But the question is, is this really an attempt of
11   material support?  And if you look at *Holder*, they make a
12   specific exception for the personnel prong.  And can I just
13   quote, and then I'll move on?

14             THE COURT:  Sure.  Go ahead.

15             MR. DURKIN:  "Under the material support statute,
16   plaintiffs may say anything they wish on any topic," something
17   the government doesn't seem to understand.  "They may speak and
18   write freely about the PKK and LTTE" -- and just as an aside, I
19   find it fascinating that the PKK is now our friend, because the
20   PKK -- Turkey has now permitted the PKK, which is also one of
21   their globally designated terrorist organizations that has now
22   become our friend because they're going to fight Assad for us;
23   and if you don't see the absurdity of that, I don't know what
24   we can do -- "the government of Turkey and Sri Lanka, human
25   rights, and international law.  They may advocate before the

1  United Nations.  The government states: 'The statute does not
2  prohibit independent advocacy or expression of any kind.'  It
3  also does not prevent plaintiffs from becoming members of the
4  PKK and LTTE or impose any sanction on them for doing so.
5  Congress has not, therefore, sought to suppress ideas or
6  opinions in the form of pure political speech.  Rather,
7  Congress has prohibited material support which most often does
8  not take the form of speech at all.  And when it does, the
9  statute is carefully drawn to cover only a narrow category of
10  speech to, under the direction of, or in coordination with
11  foreign terrorist groups that the speaker knows to be terrorist
12  organizations."
13          Now, that's an important, if not huge, factor in this
14  case, because I submit and I think you can see from the
15  exhibits we've provided you that there is an enormous amount of
16  evidence pointing to the proposition or inference, if you will,
17  that they really wanted to go live in a caliphate and that they
18  considered it their religious obligation.  And that is spread
19  throughout this whole evidence.
20          If you look at the letters, you have the letter --
21  you have Government Exhibit 4 --
22          THE COURT:  Yes.
23          MR. DURKIN:  -- which is our client's; Government
24  Exhibit 6, which is Minor 1; Government Exhibit 7, which is
25  Minor 1; and Government Exhibit 5, which is Minor 2.

1    And if you read them carefully and in context, there

2    are any number of religious themes that talk about their

3    religious obligations.  I think that's clear from that, which

4    is -- which is why I presented to you the affidavit of

5    Professor Schreiner from the University of Chicago.  I don't

6    know whether you've had a chance to read it --

7    THE COURT:  I have.

8    MR. DURKIN:  -- in its entirety, but I'd like to read

9    at least a portion of it into the record.  I'm not going to

10    read the whole thing.

11    THE COURT:  I hope not.  It's pretty long.

12    MR. DURKIN:  I understand, but it's important.  It's

13    important because what the government is trying to do is use

14    the statements of religious belief as somehow an inference that

15    these people are dangerous and somehow they're terrorists,

16    which is preposterous, and it's a fool's mission to try to do

17    it.

18    And all you need to do is look at what Professor

19    Schreiner says, which is:  "These letters express" -- and she

20    says she's read all the letters -- "These letters express

21    several recurring religious themes; the temptations posed by

22    the comfortable worldly life, the danger of Satan, calls for

23    repentance, the need for self-denial and sacrifice, and the

24    necessity of suffering and dying or being martyred for the true

25    faith."

1      And this is the important part.  And the government

2    knows this or has to know this.  "These themes are not at all

3    unique to Islam.  Throughout the Christian tradition, these

4    ideas have been central to Christian life and teaching.

5    Furthermore, just as these children quote the Qur'an and

6    Hadiths, so, too, Christians have found support for these

7    beliefs in the Bible.  The following examples provide only a

8    brief trajectory of those in the history of Christianity."

9      She goes back to as early as Saint Eucherius, the

10    Bishop of Lyon from 380 to 449; Saint Gregory the Great in the

11    6th century; Saint Bruno, the founder of the Carthusian Order;

12    the French Benedictine, Bernard of Cluny, wrote about the same

13    thing, the contempt of the world.

14      Those are constant themes, and to somehow suggest

15    that that's somehow a rejection of Western values, it may well

16    be, but that should be to their credit, not to their demise.

17    Perhaps they are following their faith, and perhaps they -- you

18    know, they do consider it, you know, to have some contempt for

19    the world, just like a lot of the Christians have throughout

20    the history.

21      She goes on to talk about Tertullian; the 15th

22    century Dominican Friar, Savonarola; the martyrs, Ignatius of

23    Antioch, Polycarp, the Bishop of Smyrna, Justin Martyr, and

24    others.

25      And ironically she points out that November 2nd,

1    yesterday, is the day when the Eastern Orthodox Church

2    commemorates the death of 7,000 martyrs who died under the

3    reign of King Sapor from 310 to 381.  "To this day, all over

4    the world, those who belong to the Orthodox Church sing the

5    Troparion for the Persian Martyrs."

6         In a different context, I suppose they could be

7    accused of abandoning Western values.

8         She talks then about Martin Luther.  She talks about

9    the Great Second Awakening of Charles Finney in the burned-over

10   district, the fire-and-brimstone preachers of that area -- era.

11        And then she talks about none other than Dietrich

12   Bonhoeffer, who gave sermons entitled "On Repentance," "The

13   Church and the People of the World," Learning to Die," and "the

14   Secret of Suffering" and notes ironically Bonhoeffer was

15   executed for trying to assassinate Hitler on April 9, 1945.

16        The other part that I found tremendously interesting

17   was the next-to-the-last page of her letter where she talks

18   about the 10th century.  Among the external enemies of

19   Christianity in the 10th century who inspired such martyrs

20   about good and evil and martyrdom were the Vikings and Muslims.

21   Drawing on writings from the Christian tradition, these

22   readers -- these writers believed that the final ruler at the

23   end of the time would conquer the Muslims and restore the

24   fullness of the Roman Empire.

25        The more things change, the more things remain the

1    same, except if you take a position against the Western values,

2    I guess which means liberal American democracy.  I take it

3    that's what it means here today.  How dare anyone suggest that

4    they reject free markets and American liberal democracy?

5            We sent pictures -- we have pictures downloaded from

6    a video that somehow is supposed to suggest something.  And we

7    could have brought in pictures of American atrocities that

8    wouldn't look too well either in our history, but I'm not going

9    to stoop to that level to go there.  That's patent rhetoric,

10   inflammatory nonsense to say somehow because somebody

11   downloaded that video that somehow they're dangerous to the

12   community, and there's no combination of conditions that can

13   satisfy anything.

14           One of the things -- one of the things I found most

15   amazing is that apparently all that matters to this government,

16   whoever it may be, because I've always thought in the U.S.

17   Attorney's Office in these cases it's somebody else that drives

18   the ship, but apparently what they're suggesting is if you give

19   up on your American values or you dare say, you make those kind

20   of derogatory comments about our wonderful lifestyle here, that

21   you forfeited your citizenship.

22           But what I find interesting is just less than two

23   months ago President Obama gave a speech before the United

24   Nations on September 24, 2014.  That's Exhibit No. 5.  It's in

25   folder 5.

1        THE COURT:  Yes.

2        MR. DURKIN:  We didn't mark them because we weren't

3   sure how we were going to do it, but for the sake of ease,

4   we'll just use the folder numbers, which is 5.

5        THE COURT:  Okay.

6        MR. DURKIN:  In that very speech, President Obama --

7   apparently this message didn't get to the Justice Department or

8   the national security agencies that might be prosecuting this

9   case -- "that means contesting the space the terrorist occupy,

10  including the Internet and social media.  Their propaganda has

11  coerced young people to travel abroad to fight their wars and

12  turn students, just like we have, young people full of

13  potential into suicide bombers.  We must offer an alternative

14  vision."

15       This is the alternative vision we're getting today.

16  Jail, locked up.

17       We have in Exhibit 6, right after or just before the

18  President spoke, wonderful timing, on September 15th, we have

19  his Attorney General announcing a program to counter violent

20  extremists, which I find interesting.  Where is that program

21  for this defendant, and why doesn't he benefit from something

22  like that?

23       I would submit that one of the reasons that he should

24  be released on conditions is that so he can get proper

25  counseling in that regard, just as the Attorney General

1    suggests, and so that he can get some correct information about

2    what is obviously some misguided beliefs of his that maybe it's

3    easier for 68-year-olds to say than it is for 19-year-olds to

4    say.

5            But what I also find interesting -- and the

6    government must have missed this one, too -- is the 60 Minutes

7    interview -- this is in folder 22, Judge.

8            THE COURT:  Yes.

9            MR. DURKIN:  The 60 Minutes interview of Director

10   Comey of the FBI.

11           THE COURT:  That's the one you have --

12           MR. DURKIN:  I'm sorry?

13           THE COURT:  I'm just getting it from Mary.  I've got

14   it.

15           MR. DURKIN:  They must have missed this interview,

16   too, because here Mr. Comey says that the people going overseas

17   can come back.  They're going to be watched, but they can come

18   back.  One might think that if you could come back that you

19   might be able to go.

20           Now, I understand this is -- what's the date of this,

21   October 5th?  But that was the policy.  What's that all about?

22   Is that something that you could take into account?

23           I suggest you could, because that's really the issue

24   of the material support, again going to the weight of the

25   evidence.  The real issue is, can this even classify as an

1    attempt to go provide material support?  They were, after all,

2    only as far as O'Hare -- the metal detector at O'Hare.  They

3    had a stop in Istanbul.  They had round-trip tickets.  Is that

4    a sufficient attempt?  We'll see.  We'll see.

5         The government makes a big deal about -- apparently

6    about this browser search, which I find interesting.  I think

7    that's Government Exhibit -- I want you to understand what that

8    is.  That just means that they have a program that they use

9    that somehow can go into any websites that you may -- that they

10   may be interested in seeing whether you went on, and if you

11   did, they can do some mathematical equation to find out how

12   you -- what you did.

13        So all that means is that he searched the term

14   "suicide bombings."  He searched the term "suicide."

15   Interestingly, he also, to my point, more than he did "suicide

16   bombing" or "suicide," he triggered or he searched "Khilafah,"

17   which means "caliphate," which I think supports our inference,

18   the inference that we're asking you to draw, that there's every

19   bit as much of an interest that they wanted to go live in a

20   caliphate, which isn't a crime yet.  It could be, I suppose,

21   but we haven't gotten there yet.  It's coming.

22        He also searched "America, Hijra, interfaith," but

23   what I get a kick out of -- Mr. Nash and I were talking about

24   this.  We may be the only ones in the room old enough to

25   remember Minnie Miñoso, but I said, just because I searched

1    "suicide" or "suicide bombings," it would be no different if I

2    searched "Minnie Miñoso," and then you draw the inference that

3    somehow I played for the White Sox.  I don't think that works.

4        I don't know what that means.  It doesn't mean

5    anything other than nonsense, is what it means.

6        The government talked about a brief interview that

7    they gave.  Well, it's kind of like -- just like our view of

8    the evidence.  I believe the evidence that you have shows that

9    Minor No. 1 was held for a total of 7-1/2 hours, and her first

10   interview was 3-1/2 hours, in which she repeatedly said she

11   didn't want to speak to the agents.  That's why we gave you

12   Government Exhibit -- I mean, that's why we gave you Exhibit

13   19.

14       And obviously I don't want the name mentioned, but if

15   you look at Exhibit 19, that is a draft transcript of the video

16   recording of that interview that we had.  And she any number of

17   times says, "I want -- I want -- I don't want to talk right

18   now.  Why are you harassing us?  Why" --

19       THE COURT:  Can you be more specific, Mr. Durkin?

20       MR. DURKIN:  Well, if I could get my marked-up copy.

21       If you look at page -- can I have a second, please?

22   Somehow they're out of order.

23       Well, just start out right at number 1.

24       "The FBI:  You volunteered to come down

25        to talk to us.

1          "No, I didn't.  No.  I did it because

2     I have to.

3          "Well, you don't have to stay here.

4     But it would be good if you talked to us

5     a little bit.  You're not going to miss

6     your flight or anything.  We're going to

7     make sure you get on your flight.  You're

8     not going to miss your flight, so is that

9     okay?"

10          And then she protested.

11          "So what you're asking us to do -- do

12     you mind talking to us right here and now?

13     It's more private in here."

14          And then she says, "Do I have to talk

15     at all?

16          "What's that?" the FBI says.

17          "Do I have to talk at all?

18          "You don't have to talk at all

19     if you want to, no.  You don't have to,

20     but that's your choice.  But if you don't

21     want to talk to us now, it's probably a

22     better idea you did talk to us because --

23     now because we may approach you later then.

24     You know, we may approach you when you

25     come back from where you're going."

1    Then page 2 carries over from 1.

2    "Where do you want to go?

3    "Just board the plane.

4    "Just board the plane?

5    "Yes," nodding.

6    "Of course that's an option.

7    "So can I do that?

8    "Give me a second."

9    He runs out to talk to his supervisors.  Then she

10 starts complaining to the person sitting there who -- that, you

11 know, that she's trying -- the FBI agent is still sitting there

12 saying, "Other people were stopped as well."

13    She said, "No, they didn't.  They only stopped us."

14    Then -- and this is -- you know, she's not a fool.

15 They say to her, you know, bottom of page 2:

16    "If you want to talk to us, we can

17    find out who you're going to visit so you

18    don't have to answer, but your brother might

19    have the answers.  So if you help us answer

20    a couple of questions we have before anybody

21    travels, then it would work."

22    And then she says, "I would, but you're

23    talking like it might take -- you might take

24    something that I say and put it out of context."

25    Page 4, "That's where you're going to stay?

1          Are you planning in stay in Turkey?

2               "Can I not talk?"

3               THE COURT:  And the FBI says, "Yeah, you cannot

4     talk."

5               MR. DURKIN:  Right.  But then I think the interesting

6     debate some day as to whether she was free to go --

7               THE COURT:  That's, again, a debate for another --

8               MR. DURKIN:  I understand.

9               THE COURT:  -- time.

10              MR. DURKIN:  It goes to the weight, however, I might

11    add.

12              THE COURT:  But what is your point?  What is your

13    overall point with respect to --

14              MR. DURKIN:  My point is, my overall --

15              THE COURT REPORTER:  I'm sorry, counsel.

16              THE COURT:  Yes, I actually need to finish talking

17    before you can start.

18              MR. DURKIN:  I'm sorry.  I thought you were done.

19              THE COURT:  What I want to know is what is the

20    argument you're making from this transcript relevant to the

21    issue of detention of Mr. Khan?

22              I understand that what you're saying is this minor

23    was at points reluctant to discuss her trip with the FBI, but

24    of what import is that to my decision?

25              MR. DURKIN:  Well, take a look at page 11.

1          The FBI says, "I don't know about you" -- it's kind

2    of, like, the top third of the page -- "It's up to them.

3          "It's up to your brothers.  Your older

4          brother is talking to us.  Your younger brother

5          is talking to us.  They don't want to go do

6          what we know what you're planning to do,

7          and then they don't have to if they don't

8          want to.  We're not going to make them go.

9          We're here for your safety and your

10         brothers' safety.  We don't want you guys

11         to hurt yourselves overseas and hurt anybody."

12         She says, "We won't hurt anybody."

13         THE COURT:  Okay.

14         MR. DURKIN:  "If that's your story, that's fine.

15         But your brothers are saying something else."

16         And she says, "No, they're not.  I know for

17         sure that they're saying that they'll not

18         hurt anybody either.  Like, none of us will

19         ever hurt anybody."

20         That's part of my point.

21         THE COURT:  Okay.

22         MR. DURKIN:  Given under severe duress, I would

23    submit, again, supporting the idea that maybe they just wanted

24    to go live in caliphate.

25         We gave you two posts from our client's Facebook, one

1    on -- No. 2 is on September 2nd, 2014.  No. 3 is October 2nd,
2    2014.

3           The one on September 2nd says, "ISIS's actions are
4    just going to make our lives harder."  Hardly the mind-set of a
5    man who wants to join them to do jihad.

6           No. 3, October 2nd, 2014, two days before they go.
7    "Sometimes I wish I could just go to the desert to Mauritania,
8    live under a sheik, study the Qur'an, and be a shepherd, a
9    simple life away from all this craziness."

10          Again, it doesn't indicate somebody wants to go do
11   jihad.  It does indicate some confusion which maybe someone
12   might expect for a 19-year-old with his ideas and his
13   conflicting thoughts about his religious obligation.

14          We also gave you an Exhibit No. 8, which is articles
15   about Denmark's program for deprogramming, which seems far more
16   progressive than anything we have in the United States, along
17   with we've given you excerpts from other deprogramming
18   materials in other countries.  I would submit that that's the
19   approach that needs to be taken here.

20          I'd also submit that if you were to impose that as a
21   condition that Mr. Khan will willingly go along with any
22   counseling or therapy in that regard.  He is willing to do so,
23   as are his parents, as are all the children.

24          And then we've showed you some things that I think
25   undermines all the government bluster and rhetoric here.

1           We gave you an article -- in Exhibits 10, 11, and 12,
2    we've given you articles talking about these Denver teenagers
3    who were encouraged to join ISIS online.  They were returned
4    home, I might add.  They got as far as Germany.  I think they
5    were of -- I think they were of Somali ethnic extraction,
6    but they were --

7           THE COURT:  Yes, Somali.

8           MR. DURKIN:  -- citizens, I believe.  Something that
9    people seem to forget here.

10          They -- and another article talking about them,
11   speaking of the top Islamic State terrorist, another article
12   about ISIS recruiting American teenage girls.  And the
13   reason -- that's in 12 and 13.

14          The thing that's interesting in 13 is the idea of the
15   online premises of husbands -- that the recruiting of American
16   teenage girls to come overseas and become husbands, which is
17   consistent with some of the letters, I believe.  And if it is
18   not in a letter, then it's in the affidavit that you're
19   familiar with --

20          THE COURT:  Yes.

21          MR. DURKIN:  -- where she concedes -- this is
22   Minor 1 --

23          THE COURT:  Right.

24          MR. DURKIN:  -- that all she's going to be able to do
25   is be a bride.

1           Now, do we really want to stoop to the level of

2   saying that if you go -- if you want to go marry somebody who

3   is a member of a globally designated terrorist organization

4   that you're supplying material support?

5           THE COURT:  Well, she's not charged, is she?

6           MR. DURKIN:  Well, she's not charged, but they use --

7   they use her statements to infer that he's in support of that

8   or she's a co-conspirator, whatever you want to say.  I

9   understand that.

10          But my point is, it points to the ambivalence of the

11  evidence, because you know as well as I do that that's an

12  abominable characterization of women to somehow suggest that we

13  would provide -- that somebody who dared go over there to marry

14  one of these goofs is providing material support.  That's kind

15  of an old trope about, you know, wives and being chattel.  And,

16  you know, I hope we're not going to go to that level just

17  because we have a statute that we can conceivably argue it

18  under.  But that's why we presented those exhibits.

19          And then the Denver case, in 15 and 16 we've

20  submitted articles about the Denver case.  And what I find

21  interesting about the Denver case -- and this is a case of

22  Shannon Conley -- is that those articles and the complaint, the

23  criminal complaint, make reference to the fact that the FBI

24  went to her parents three or four different times to try to get

25  them to counsel this girl not to go ahead.  And I believe what

1    she was going to do is similar to Minor 1.  She kept insisting

2    that nothing was going to stop her from going to marry this

3    person she was in love with who happened to be a mujahideen or

4    a jihadi, and she was going.

5          But I'd like to know how it is that Shannon Conley

6    gets reported to her parents, and Hamzah Khan gets arrested.

7    I'd like them to justify that.  And I don't think there is any

8    justification for it other than the obvious.  But that might be

9    because I'm Irish.

10         But I've said from day one, the first time I ever got

11    into these terrorism cases when it involved younger people, is

12    that if they were Irish Catholic and they were going over to

13    fight for the IRA, they'd have been grabbed by their ear by the

14    FBI and pulled into their parents.

15         That's apparently what they did to Shannon Conley,

16    but they didn't do that to Hamzah Khan, which I think is

17    significant, because I don't see a difference between Shannon

18    Conley and Hamzah Khan.  They are both Americans, first and

19    foremost.

20         And I believe -- and that's why I gave you -- we gave

21    you Exhibit 17, which is this Dabiq issue, volume 4.  It's a

22    very, very slick production.  This is the ISIS -- one of the

23    ISIS recruiting tools.  And, you know, if you take the time to

24    look at that, I think you'll agree with me as to how slick it

25    is, how alluring it could be, and how it could really confuse

1  people who have fervent, fundamentalist-type Islamic beliefs,

2  which, as you may know, at least -- you know, the family

3  dresses very conservatively.  I mean, his mother is here.  You

4  can see her garb.  All the women dress that way.

5  You know, I don't have a dog in that fight, and it's

6  not my business to judge it.  But when you look at this Dabiq

7  article and then you couple that with the abstracts we provided

8  you about teenagers' psychological development, which I think

9  is significant -- there's an abstract; we couldn't get you the

10  actual article itself -- but Dr. Lawrence Steinberg gave -- I

11  heard about this this week -- he gave a lecture at a forensic

12  psychiatry conference that had a couple of programs dealing

13  with Guantanamo and the force feeding going on at Guantanamo.

14  But I'm told that one of the lectures was consistent

15  with this abstract.  It talked about the fact that an

16  adolescent mind, which is not a shock to any parent --

17  THE COURT:  No.

18  MR. DURKIN:  -- is somewhat malleable and impulsive

19  and compulsive and that before it gets hard wired, for want of

20  a more sophisticated term, there is time to modify that

21  behavior.

22  And I think that's really what's behind all the

23  concepts of deprogramming and so forth, which I think is in

24  need here.

25  The other two exhibits I think I've talked to --

1     about, the interviews and the affidavit in support of the

2     search warrant. I think there's a lot of things in that that a

3     couple of ways -- I'm assuming that one might have to be kept

4     under seal.

5              THE COURT: That and the pretrial services report --

6              MR. DURKIN: Yeah, so I would ask that --

7              THE COURT: -- cannot be released to the public.

8              MR. DURKIN: Yeah, I'd ask that 21 and 7 be kept

9     under seal but that the rest be made public.

10             And we'll need to -- before the transcripts are

11     released, we'll redact the names. So we'll provide you with a

12     better copy by this afternoon.

13             THE COURT: All right.

14             MR. DURKIN: All of which is -- all of which is to

15     say, I think -- I don't think pretrial services was off base at

16     all.

17             What we're prepared to propose -- and I understand

18     the government's objection to all the children living in the

19     same house. But if you're willing to go there, we would

20     proffer that Mr. Khan's brother, Rafi Khan -- I don't know if

21     he's here today. Is he here? He's not here today. But he

22     lives at -- I don't want to make the address public, but he

23     lives in Lombard, which is not far from -- I think it's

24     somewhere nearby. I don't know Bolingbrook to Lombard.

25             THE COURT: It's a distance.

1    MR. DURKIN:  Okay.  Well, that's probably a good
2    thing.
3    THE COURT:  Lombard is north and west.
4    MR. DURKIN:  We would propose that he live there with
5    his Uncle Rafi and his father, Shafi, if it would help, and I
6    think it would.  Both of them would be willing to be
7    third-party custodians, and his father would move in to
8    supervise 24 hours a day because he works from home, so he
9    could just as easily do that.
10   There are also some other places they could live.  I
11   understand the -- and we can supply all that to you if need be.
12   The family is also willing to post their home which they own
13   outright, which I think has close to $100,000, or maybe a
14   little more, in equity.  The mother and father are willing to
15   be third-party custodians, and as is the brother, Rafi.  And we
16   have several others that would be willing to do that if your
17   Honor is inclined.  Obviously I don't want to start reading all
18   that into the record right now.
19   THE COURT:  Understood.
20   MR. DURKIN:  But I think if you're willing to go
21   there, we could come back and supply all that to you.
22   I think that, you know, as you know, the statute
23   doesn't say you have to make it foolproof, but I think
24   electronic monitoring and living in the custody of his parents,
25   at least his father and his uncle, would -- with at-home

1    detention would certainly meet the need of the statute to be

2    reasonably assured.

3            Same goes for flight.  He doesn't have a passport.

4    He has nowhere to go.  And I just -- I don't see this as a

5    flight-risk case at all.

6            I understand that you could say, "Oh, well, he wanted

7    to take off."  I would note that -- and I meant to say this

8    earlier -- I have a different read of all those letters and the

9    idea that they were somehow abandoning their family.  The

10   letters are replete with requests to -- for the parents to

11   come.  I mean, they're really, you know, rather naively

12   suggesting that, you know, it's their religious obligation to

13   do this, and why don't you join us.

14           There is the one reference, I know, that they read

15   that said, "I probably won't see you again."  But for that

16   there's also, I want to say, three or four different references

17   to the fact that "Please come.  We'll let you know.  You would

18   like living there."

19           I think there's at least three --

20       (Discussion was had off the record.)

21           MR. DURKIN:  I think Mr. Herman says there's at least

22   two or three references and particularly in our client's email.

23           THE COURT:  I read the letters.

24           MR. DURKIN:  Okay.  And, you know, obviously, you

25   know, the other conditions, you could fashion.  You fashion

1    them every day.  Keep him away from electronics, keep him off

2    the Internet.  There's all kinds of ways we could fashion

3    restrictions and would give you a reasonable degree of

4    certainty that he's not going to be a danger.

5              But I go back, most importantly, to the whole issue

6    of if we really mean what we say and if the President means

7    what he says and the Attorney General means what he says that

8    this is a problem with our children -- and it is; okay, it is

9    clearly a problem with our children -- that he is willing to

10   submit to treatment, and he needs it.  And he will not get it

11   locked up.  And if the government really means what they say,

12   that's what he needs.

13             If we want to solve this problem, we are not going to

14   solve it by threatening to lock people up forever.  That's just

15   not going to work.  And you know that; I know that; and

16   everybody in this room knows that.  And somehow we have to find

17   a solution, because these are American children.  These are not

18   Syrian children who happen to come here and dare invade our

19   lands.  They are not barbarians.  They are our children.

20             And unless we want to say we just can't do that when

21   it comes to Muslim children, then we have to say we're going to

22   give you every benefit of the doubt, and we're going to try to

23   reach out to you.

24             Let this case proceed to trial, because I think we

25   can win it, but he shouldn't have to be locked up during that

1    whole time.  And even regardless of whether we can win or not,

2    he needs that kind of help.  And that's what we should be

3    doing.

4              And there are conditions that you can impose.  If he

5    were a drug addict, we wouldn't be having this argument.  You

6    know, this is very close to a thought crime.  And this is a

7    very, very serious issue, and this also has a tremendous amount

8    of future impact, I think.

9              Do we want to -- do we really want to force the kids

10   to go further underground who buy this argument?  Obviously

11   somebody told the President that was true.  He wouldn't have

12   said it before the U.N.  And there are all kinds of people

13   saying that this is a problem.

14             And as I've said to anybody that wants to listen,

15   this is not -- you know, this is not new in history.  How many

16   people ran off to fight against Franco?  You know, how many

17   people went to go join the IRA?  How many people go off to join

18   the French Foreign Legion?

19             This is not a problem unique to Muslims any more

20   than, you know, the idea of hitting the road and going West,

21   young man, is unique.

22             You know, it's a way to get out of where you are.

23   It's a way to get out of -- to find something bigger than

24   yourself.  Misguided, obviously, we can say.  But the question

25   is, he's a 19-year-old kid.  The other two are 17 -- now 18,

1    16.  We can't give up on these kids because they have bad

2    thoughts, because they don't like filth.  They don't like free

3    markets, apparently.  You know, but neither do I.  It's a good

4    thing they don't lock me up.  I always wondered about that, but

5    if I keep it up, they might.

6         But this is an important, important issue of the day.

7    And the government is taking, in my humble opinion, a

8    wrong-headed approach.  He should be released.  He should be

9    treated like everyone else.  He is an American, not a Muslim.

10   He's an American.  And that's all that matters; that's all that

11   should matter here.  Thank you.

12        THE COURT:  Anything further from the government?

13        MR. HILLER:  Judge, just briefly.

14        THE COURT:  Sure.

15        MR. HILLER:  Judge, just very briefly.

16        As I said in my opening argument, this case and the

17   critical evidence for this Court is, it's the defendant's

18   actions.  The defendant is not being prosecuted for his words.

19   This is not a thought crime.  This is not a thought

20   prosecution, but it's the defendant's actions and his efforts

21   to attempt to materially support a foreign terrorist

22   organization.  And that is the difference.

23        Clearly Mr. Durkin has some political and

24   philosophical differences with the United States Government,

25   the United States Department of Justice, how these cases are

1     investigated, how these cases are prosecuted.  And there's a

2     time and place for that debate.

3          It's just not relevant in this hearing.  It doesn't

4     apply to the defendant's dangerousness or the risk of flight,

5     as the Court noted.

6          Very briefly on the treatment issue.  There's no

7     foundation.  There's no de-radicalization program available to

8     this Court, at least that the government is aware of.  There is

9     no such alternative that's meaningfully available, and the

10    government is not aware of any information that this defendant

11    is ripe for such a program.

12         And obviously, if the Court has any questions, we're

13    available to respond.

14         THE COURT:  Your argument is that the defendant is a

15    danger if released to this community here?

16         MR. HILLER:  Correct, your Honor.

17         THE COURT:  What is the evidence to back that up?

18         MR. HILLER:  Well, that he is looking to materially

19    support ISIL, which obviously is a barbaric foreign terrorist

20    organization.

21         THE COURT:  In abroad?

22         MR. HILLER:  Absolutely.

23         THE COURT:  What about here in the Northern District

24    of Illinois, what's your argument with respect to that?

25         MR. HILLER:  He is a radicalized young man, and that

1    radicalization, that point that got him to want to join that

2    barbaric of an organization, he was physically stopped, but he

3    was not mentally stopped.  And once turned around, what is he

4    going to do?

5            And the Court can look to the media reports recently

6    in the New York Times out of Canada, what's being reported

7    there, that the individual who brutally ran down the Canadian

8    soldier was someone who was allegedly turned around attempting

9    to get to Syria.  There are other examples that are recently

10   reporting in the media.

11           THE COURT:  So you're asking the Court to infer that

12   because he was frustrated in his attempt to join -- allegedly

13   join ISIS in Syria that he will, because of his radicalized

14   beliefs, resort to some sort of violence here at home?  Is that

15   essentially what you're arguing?

16           MR. HILLER:  Absolutely, your Honor.  But even more

17   to that, ISIL is dedicated -- even if you take what ISIL is

18   specifically doing in Syria and Iraq, that level of violence

19   and that level to commit genocide and attacking innocent

20   people, just because that's happening in another geographic

21   location, the radicalization to get to that point, we can't

22   say, "Well, he's so radicalized, he's willing to join that

23   barbaric of an organization, but because he didn't make it

24   there, he's no longer a danger here."

25           All of that venom is pointed somewhere else, and it's

1    just pacified because he was stopped at O'Hare.  There's no

2    basis to be able to make that judgment, to limit the

3    dangerousness just because he was attempting to travel.  That

4    danger still exists here today.

5              THE COURT:  Anything further?

6              MR. HILLER:  No, your Honor.  Thank you for your time

7    today.

8              THE COURT:  Anything further from you, Mr. Durkin?

9              MR. DURKIN:  I just think they conceded that it's

10   thoughts and not action.  That's the right question to be

11   asking.

12             THE COURT:  All right.  We're going to take 15

13   minutes, and then I'll come back and make my ruling.

14         (Short recess.)

15             THE CLERK:  Recalling Case No. 14 CR 564, USA versus

16   Khan.

17             THE COURT:  All right.  Do you want to reenter your

18   appearances just for form sake?

19             MR. HILLER:  Absolutely, your Honor.

20             Matt Hiller, Sean Driscoll, and Angel Krull on behalf

21   of the United States.

22             MR. DURKIN:  Tom Durkin and Josh Herman for the

23   defendant.

24             THE COURT:  All right.  Well, I want to be clear here

25   about what my role is.  Here's not what is in front of me

1   today.

2           The wisdom or otherwise of America's geopolitical

3   foreign policy, the choices our country has made on those

4   issues, that's not in front of me.  Nor is it in front of me

5   that, as you eloquently pointed out, Mr. Durkin, the fact that

6   over the years, over history, many terrible and awful things

7   are done in the name of God or Allah.  That is also not in

8   front of me.

9           Also what is not in front of me, why the government

10  chooses to prosecute some people who desire to join ISIS or

11  other terrorist organization or not others.  That's a decision

12  of the Executive Branch.  It is not for this Court to question,

13  and I will not question it in the context of this hearing.

14          Or even the wisdom of prosecution versus other

15  methods of de-radicalizing young people who are attracted to

16  this kind of an organization as President Obama discussed in

17  the speech that you pointed out and made part of this record,

18  again, that is a decision or a set of decisions left for other

19  people than me, a magistrate judge here in Chicago.

20          And I also want to be clear with respect to everyone

21  that Mr. Khan is not being charged, as I understand the charge

22  and as I reviewed the criminal complaint in this case, which I

23  reviewed carefully and which I signed, with political

24  expression or thoughts or acting on religious faith or because

25  he disagrees with the United States Government.  He wasn't

1   charged with any of that.

2          He was charged because he acted or attempted to act

3   in a way that violates the law, if proven.  You'll have a trial

4   in this case, and you'll have many good arguments to make.  But

5   in my opinion, the evidence that he was attempting to leave the

6   United States of America to join an organization that our

7   government has designated a terrorist organization, that is,

8   ISIS -- it's ISIS; sometimes it's ISIL; sometimes it's IS --

9   but in any event, the evidence that he was planning on doing

10   that and providing it support is actually very strong.

11          And his words and his writings are not purely why he

12   was prosecuted, but they do -- they are important, because they

13   give the context behind the actions which are the basis for the

14   complaint in this case.

15          So they are important, but that's not why he's being

16   prosecuted.  That's the context of the prosecution.  That's

17   not -- that's not the crime with which he's charged.  And I

18   think it's important that I point all of that out.

19          My job, my only job here is to determine whether

20   there are any conditions which can be imposed to assure both

21   his appearance and the safety of this community, not the world

22   community but the community right here in the Northern District

23   of Illinois.

24          The government has the burden to show, because

25   they've moved to detain your client, by a preponderance of

1  evidence that he's a flight risk, by clear and convincing

2  danger -- I'm sorry -- by clear and convincing evidence that

3  he's a danger to the community.

4          The pretrial services report, as well as you,

5  Mr. Durkin, have argued in favor that I impose conditions which

6  would include -- and I think I have them all -- a third-party

7  custodian, that is, some family member, including but not

8  limited to his father, maybe his uncle; security, that is, the

9  value of the Khan's home, electronic monitoring, and so on.

10         All of the magistrate judges here in our building

11 respect the work of the pretrial services officers very much,

12 but this is the rare case where really what they evaluate is

13 not really what's before the Court in terms of what's pertinent

14 to the decision making, because they are not allowed actually

15 under the statute to consider the weight of the evidence.  And

16 it's really the weight of the evidence of -- that

17 overwhelmingly convinces me that Mr. Khan is a flight risk.

18         Based on the complaint in this case, which as I said

19 I signed, there's probable cause to believe the defendant,

20 because of his religious beliefs -- which I believe he holds

21 quite sincerely, and he has a right to his religious beliefs;

22 I'm not questioning that -- but because of those beliefs and

23 what those beliefs led him to believe, was prepared to abandon

24 his home, his family, his citizenship, and his country to join

25 ISIS, an entity which our government has designated to be a

1  terrorist organization.

2       And I don't hear you, Mr. Durkin, arguing that that

3  is not the case, that --

4       MR. DURKIN:  No, I --

5       THE COURT:  -- ISIS is not a terrorist organization.

6       And his intention to do so, it's rare that we have

7  such clear evidence.  It's expressed in his own letters to his

8  family who, as I've just said, he was willing to abandon

9  prominently if need be unless they joined him in his quest.

10      And he in furtherance of that was willing to bring

11  his minor siblings into that fray as a result of the compulsion

12  of his beliefs, a word that both the government used and you

13  yourself used.

14      You know, I can't imagine, as I sit here right now,

15  that since the time Mr. Khan was arrested on October 4th, I

16  believe, that his views that he expressed in his writing about

17  needing, being compelled, being obligated to leave this country

18  and do what it is he planned to do have changed.

19      But in addition to that compulsion that he writes

20  about, now he's looking at a very serious criminal penalty if

21  he's convicted of this charge.  And that to me only adds to his

22  compulsion or impetus to go.

23      Now, electronic monitoring is great, and I often

24  impose it, but it's virtually ineffective if somebody really

25  wants to leave and especially if the intent is to leave and not

1   come back, which is what is expressed in the writings that have

2   been introduced into evidence here today.

3          On the notion of third-party custodians, which I

4   considered very carefully, he was living with his parents

5   during the time in which he was planning to do this and

6   actively discussing it with other people.  And it's in their

7   home that the most compelling evidence that he is a flight risk

8   and his involvement in this activity was found.

9          And apparently, according to your argument, they had

10  no idea that he and their two other children, minor children,

11  were raising money, buying plane tickets, leaving their home,

12  and attempting to leave the country.

13         So it's really difficult for me to see how his

14  father -- and really his uncle is one step removed from his

15  father in terms of relationship -- could possibly supervise

16  somebody who was so actively planning on severing his ties to

17  them.

18         You're right when you point out that he invited them

19  to join them, but it was also clear from that same writing that

20  if they didn't, he was perfectly willing to live the rest of

21  his life in the caliphate and never see his family again.  And

22  I don't think any of that has changed.

23         And all of those factors point very clearly by a

24  preponderance of the evidence that he's a flight risk, and

25  there are no combinations of conditions that can be fashioned

1    to ensure his presence here in court.

2         You know, on the issue of danger to the community,
3    that's a higher standard for the government.  The government
4    has to establish that by clear and convincing evidence.  And
5    really what they're asking me to do is to infer from the
6    commitment to jihad, which is expressed, you know, over and
7    over and over again in his writings, a jihad which he believes
8    he is compelled as a practicing Muslim to do -- and that's his
9    belief -- that because of that, having been frustrated here in
10   his attempt to leave the country and join ISIS, that he's been
11   sufficiently radicalized so that he will turn to something here
12   closer at home.

13        I mean, I think, Mr. Hiller, I've summarized your
14   argument.

15        You know, that's a harder argument for me to accept,
16   and it's frankly moot, given my previous finding.  But one
17   thing really stands out to me when I -- and I had a lot of time
18   to review the record in this case.  This hearing happened a lot
19   later than most detention hearings do relative to the arrest in
20   this case.

21        The writings that have been introduced into evidence
22   show me that the defendant is not stable.  He's not a stable
23   person.  This is not a person who is in control of his own
24   actions, it doesn't seem to me, in some ways.  I think he's --
25   I think you're right when you say he probably needs some sort

1    of mental health treatment, and that's unfortunate.

2            But here's the problem.  Unstable people who have a

3    firm and unshakable belief in their convictions -- and in this

4    case, the conviction is, you know, a call by a higher power to

5    do something that potentially is quite dangerous to others

6    around him -- that tips me, frankly, narrowly.  I mean, it's

7    the issue I struggled over more than flight risk.  To me the

8    flight risk is absolutely clear and uncontrovertible.

9            The dangerousness argument is more built on the

10   inference and on the writing and on the radicalization that

11   seems to be shown by those writings, but there is one aspect of

12   the writing that to me pointed clearly to find him dangerous;

13   and that is, a scorn really for those people around him, those

14   Muslims around him who aren't making the choice to practice

15   jihad.  And that suggests to me the potential for dangerousness

16   here at home.

17           His influence over his siblings in this respect is

18   also troubling to the Court.  He's clearly willing to take --

19   to take significant risks to advance his beliefs.

20           And in light of all of that, I am -- it gives the

21   Court no joy to detain a 19-year-old individual, but with the

22   record presented before me, I have no choice.

23           And I find both that Mr. Khan is a danger to the

24   community and a flight risk.

25           Anything further?

1      MR. HILLER:  Nothing, your Honor.  Thank you.

2      (Proceedings concluded.)

3

4                    C E R T I F I C A T E

5      I, Nancy L. Bistany, certify that the foregoing is a

6  complete, true, and accurate transcript from the record of

7  proceedings in the above-entitled matter.

8

9  /s/ Nancy L. Bistany, CSR, RPR, FCRR        November 17, 2014

10  Official Court Reporter                              Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25