IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 14 CR 564 |
| | ) | Judge John J. Tharp, Jr. |
| MOHAMMED HAMZAH KHAN | ) | |
| | ) | |

**DEFENDANT'S ERRATA MEMORANDUM OF LAW IN SUPPORT OF HIS
MOTION TO DISMISS THE INDICTMENT ON FIRST AMENDMENT GROUNDS**

The First Amendment of the U.S. Constitution enshrines and protects the fundamental rights of religion, speech and assembly. Historically, the exercise of those bedrock rights has been challenged by the enforcement of laws and criminal prosecutions, thereby requiring courts to arbitrate the resulting controversies, especially in times of war and national exigency. *See United States v. Robels*, 389 U.S. 258, 265 (1967) (striking down statute barring Communist organization members from working in defense facilities because statute "establishes guilt by association alone"). While prior cases arising in these times of national tension[1] more often deal with challenges related to speech, association, and political affiliation, this case presents a relatively unique instance in which the enforcement of the federal criminal laws directly and substantially impacts and impairs the very exercise of religion itself.

---

[1] This is not to suggest, however, that counsel concede that the U.S. War on Terror, the Authorization for Use of Military Force, or whatever other Executive Branch authority is being presently used to justify U.S. military intervention against ISIS or ISIL equates to its constituting an *existential* threat to the national security of the United States. *See, e.g.*, Tom Englehart, "No ISIS Is Not a Threat to the U.S.," *The Nation*, October 7, 2014; Audrey Kurth Cronin, "ISIS Is Not a Terrorist Group: Why Counterterrorism Won't Stop the Latest Jihadist Threat," *Foreign Affairs*, March/April 2015.

1

Indeed, at its heart, this case is about a young man's decision to follow his sincerely held religious beliefs that genuinely compelled him—wisely or not—to do what he believed was his singular overriding obligation to emigrate to an Islamic Caliphate. That very religious act is now being criminally prosecuted as a form of "material support" because the Islamic Caliphate,[2] was established in Syria and Iraq by this designated Foreign Terrorist Organization.[3] For two very principled reasons, that fact alone cannot, consistent with the First Amendment, transform Mr. Khan's attempt to follow his religious dictate to live in the Caliphate into material support.

First, the mere act of traveling to the Caliphate for religious reasons does not satisfy the elements of the material support statute (18 U.S.C. §2339B), specifically the provision of "personnel," which expressly requires working under a terrorist organization's direction or control. *See* §2339B(h). Second, even if the Caliphate cannot be distinguished from the terrorist organization—and each very well should be—the United States Supreme Court has made it abundantly clear that the material support statute "does not criminalize mere membership in a designated foreign terrorist organization." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010).

Whatever we may believe with respect to ISIS, and no matter how abhorrent this organization's tactics and goals may be, Mr. Khan's activities and beliefs are protected by the First

---

[2] In simple terms, a Caliphate "is an Islamic state led by a supreme religious and political leader, and it has existed in one form or another for most of the 1,400-year history of Islam." Greg Myre, *What's a Caliphate?* June 30, 2014 (available at http://www.npr.org/blogs/parallels/2014/06/30/326916530/whats-a-caliphate). Historically, the last Caliphate was the Ottoman Caliphate, which endured from 1362 until 1924 when it was abolished by the Turkish leader Kemal Ataturk. *See* Nick Danforth, *The Myth of the Caliphate: The Political History of an Idea*, FOREIGN AFFAIRS, Nov. 19, 2014, (available at http://www.foreignaffairs.com/articles/142379/nick-danforth/the-myth-of-the-caliphate) (last visited Apr. 16, 2014); http://en.wikipedia.org/wiki/Caliphate#Ottoman_Caliphate_.281362.E2.80.931924.29.

[3] The indictment names the foreign terrorist organization as the Islamic State of Iraq and the Levant. This group has become more commonly known by its various acronyms, "ISIS" or "ISIL," and both acronyms are often used conjunctively.

Amendment because evidence cannot show that Khan intended to further ISIL's terroristic goals in any fashion. Therefore, the statute, 18 U.S.C. § 2339B, *as applied to him* is unconstitutional.[4] Any contrary interpretation of §2339B to the facts of this case is forbidden by the express rule of construction set forth in the statute which prohibits construing or applying the statute to abridge the exercise of First Amendment rights. *See*, §2339B(i).

I. **RELEVANT FACTUAL BACKGROUND**

On October 4, 2014, nineteen year-old Mohammed Hamzah Khan, a United States citizen by birth, and a young Muslim man with very sincerely held religious beliefs, was arrested at O'Hare International Airport in Chicago with his two juvenile siblings as they were waiting to board an Austrian Airline flight to Istanbul, Turkey. The three teenagers had earlier that morning snuck out of their parents' Bolingbrook home to go on an adventure as foolish as it was secret. The trip, regardless of its wisdom, was nonetheless the direct result of genuine religious beliefs.

However, while the teenagers were waiting in the International Terminal (Terminal 5) for their flight, Customs and Border Protection (CBP) agents stopped and questioned the siblings. At around 2:28 pm, two CBP agents detained Mr. Khan and questioned him about his travel plans to Turkey, and one FBI agent watched the questioning. *See* Def. Exh. B (FBI Report #103);[5] *See id*. and R. 1 at pg. 8. At around 2:45 p.m., and after this questioning concluded, FBI agents transported Mr. Khan from the International Terminal and onto the airport tarmac. Mr. Khan was handcuffed, transported to Terminal 1 where the FBI has its facilities and interview rooms. *See* Def. Exh. C (FBI report #107). What followed was an 11-hour encounter with multiple FBI agents who

---

[4] Nor is this to suggest that Mr. Khan adopts or otherwise shares in all the tactics, goals and objectives of ISIS. If fact, come of the discovery to date reveals Mr. Khan's disagreement with the violence of ISIS, most particularly the beheadings which have come to be known as ISIS' trademark.

[5] All exhibits are attached to defendant's Motion to Suppress.

3

interviewed Mr. Khan on several occasions without ever telling him that he could leave, and handcuffed him whenever he left the FBI's interview room. Toward the end of this lengthy interrogation, FBI agents asked Mr. Khan about what he planned on doing in Syria upon his arrival. Mr. Khan guessed that he could potentially be involved in public service, police force work, humanitarian aid work, helping to distribute food, or a combat role. *See also* Complaint, ¶ 18. When the FBI agents asked him about the combat role, Mr. Khan tellingly told them no information had been provided to him about such a role. In response to further questioning, Mr. Khan went on to tell the FBI agents that he had no experience with weapons and that he was not going to do a training course. Additional details of this encounter, and the legal grounds for suppressing Mr. Khan's statements that resulted from it, are set forth in a contemporaneously filed Motion to Suppress. Suffice it to say, for the purposes of this First Amendment motion, nothing was said to the FBI that contradicted Mr. Khan's position that he intended to adhere to his perceived religious duty to live in what he understood to be a legitimate Islamic Caliphate.

For example, while Mr. Khan was being interviewed by FBI agents and transported between terminals in handcuffs, other FBI agents were searching his house. This search revealed dozens of notebooks from common areas belonging to Mr. Khan and his siblings. It also uncovered farewell notes that Mr. Khan and his siblings wrote to their parents before leaving for the airport. In his letter, Mr. Khan spelled out the reasons why he was, in his words, "going to the blessed land of Shaam, and leaving my home." (Def. Exh. A).[6] Mr. Khan also wrote the following to his parents:

> [A]n Islamic state has been established and it is thus obligatory upon every able bodied male and female to migrate there. I cannot live under a law in which I'm afraid to speak my beliefs I want to be ruled by the Shariah [sic], the best law for all-mankind. Tell me, if we truly were free, why do we have to live in fear? True, we can practice other aspects of

---

[6] A copy of a letter attributed to Mr. Khan was introduced by the government as an exhibit at the November 3, 2014, detention hearing.

4

> our deen but why can't we openly talk about jihad. Nonetheless, me living in comfort with my family while my other family are getting killed is plain selfish of me.

*Id.* Mr. Khan also told his parents the following:

> Lastly, the most dear people on the face of the earth are my parents. I wouldn't want anything terrible to befall them. I love my parents, but I cannot be a selfish person. I extend an invitation, to my family, to join me in the Islamic state. True, it is getting bombed, but let us not forget that we didn't come to this world for comfort. I learned this from my parents. You may have thought that I was selfish, but I hope now that you understood my motives to take as much of my family to live in the land of Islam.

*Id.* Nowhere in his letter does Mr. Khan make reference to ISIS, much less commit himself to assisting ISIS—or more to the point—working under ISIS' direction or control, as required by the material support statute.[7] To the contrary, Mr. Khan, in expressing the sincerity of his religious beliefs—if not the wisdom of the beliefs under the circumstances that exist in the newly formed Caliphate—announces that he wants to live "under" Sharia law, something he perceives to be "the best law for all-mankind."

While Mr. Khan and his siblings made it no farther than the International Terminal (Terminal 5) at O'Hare, and therefore never left the continental United States, the grand jury returned an indictment charging Mr. Khan with attempting to provide material support and resources, "namely, personnel," to the Islamic State of Iraq and the Levant ("ISIL"). (Indictment, ¶ 2).

## II. RELEVANT LEGAL BACKGROUND AND ANALYSIS

To prove a violation of the material support statute, the government must show that an individual knowingly provided material support or resources to a foreign terrorist organization while knowing that the organization was a designated terrorist organization or that it engaged in

---

[7] *See*, pp. 5-9, infra.

terrorism. 18 U.S.C. §2339B(a)(1).[8] As noted above, the only "material support" charged in the indictment is "personnel." Thus, the government must prove that Mr. Khan knowingly provided or attempted to provide one or more individuals, including himself, "to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization." §2339B(h). "Personnel" has also been defined to mean "employees or employee-like operatives who serve the designated group and work at its command." *United States v. Lindh*, 212 F. Supp. 2d 541, 572 (E.D. Va. 2002); *United States v. Abu-Jihaad*, 600 F. Supp. 2d 362, 400 (D. Conn. 2009), aff'd, 630 F.2d 102 (2d Cir. 2010) (holding that the providing of classified military information to Jihadi website does not, without more, constitute provision of personnel under §2339B).

Moreover, §2339B(h) expressly carves out an important exception for independent advocacy, which provides as follows: "Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." *Id*. Also significant is the rule of construction set forth in subsection (i) of the statute, which provides as follows: "Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States." §2339B(i).

---

[8] The relevant portion of the statute provides as follows:
> Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

6

Moreover, the most thorough and significant judicial analysis of the material support statute is set forth in the Supreme Court's 2010 *Humanitarian Law Project* decision, *supra*. That decision was the culmination of years of litigation brought by two advocacy groups who challenged the material support statute as unconstitutional because it prevented them from "seek[ing] to facilitate only the lawful, nonviolent purposes" of two foreign terrorist organizations, the Kurdistan Worker's Party (the PKK) and the Liberation Tigers of Tamil Eelam (LTTE).[9] *Humanitarian Law Project,* 561 U.S. at 8. The Supreme Court concluded that the statute was neither unconstitutionally vague under the Fifth Amendment nor did it violate the plaintiffs' rights to freedom of speech and association in violation of the First Amendment. *Id*. As such, *Humanitarian Law Project* has become the bedrock for government material support prosecutions.

However, what is good for the goose can sometimes even be good for the gander. In the course of the majority opinion, Chief Justice Roberts clarified the boundaries and reach of the material support statute. One of the most important limitations the Chief Justice instructs is that §2339B "does not criminalize mere membership in a designated foreign terrorist organization." *Id*. at 18. Rather, the Chief Justice further instructs, the statute only prohibits providing material support to that group. *Id*. As he explains for the Court, this observation echoes the government's own position that the statute *would not* prevent the plaintiffs "from becoming members in the PKK and LTTE or impose any sanction on them for doing so." *Id.* at 26 (quoting Government's Brief with emphasis added). The Chief Justice's opinion also recognized the definition of providing

---

[9] Specifically, the activities that the plaintiffs claimed the statute prohibited them from engaging in included: "(1) 'training members of the PKK on how to use humanitarian and international law to peacefully resolve disputes'; (2) "engaging in political advocacy on behalf of Kurds who live in Turkey'; and (3) 'teaching PKK members how to petition various representative bodies such as the United Nations for relief" and "(1) 'training members of the LTTE to present claims for tsunami-related aid to mediators and international bodies'; (2) peace agreements between the LTTE and the Sri Lankan government'; and (3) engaging in political advocacy on behalf of Tamils who live in Sri Lanka." *Humanitarian Law Project*, 561 U.S. at 14-15 (internal brackets removed).

material support that constitutes "personnel," as being limited to working under the terrorist organization's direction or control, and not extending to independent advocacy. *Id*. at 23 (quoting §2339B(h)). In reviewing *Humanitarian Law Project*, the Second Circuit has later gone so far as to say: "the statute leaves persons free to 'say anything they wish on any topic,' including terrorism… It does not prohibit independent advocacy of any kind… It does not prohibit or punish mere membership in or association with terrorist organizations." *United States v. Farhane*, 634 F.3d 127, 137 (2d Cir. 2011).

Chief Justice Roberts concluded the majority opinion in *Humanitarian Law Project* by leaving the door open to future as-applied challenges to the material support statute, as the one brought by Mr. Khan. The Chief Justice's observations are worth setting out in full, as they carefully delineate the scope of the Court's *Humanitarian Law Project* ruling:

> All this is not to say that any future applications of the material-support statute to speech or advocacy will survive First Amendment scrutiny. It is also not to say that any other statute relating to speech and terrorism would satisfy the First Amendment. In particular, we in no way suggest that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations. We also do not suggest that Congress could extend the same prohibition on material support at issue here to domestic organizations. We simply hold that, in prohibiting the particular forms of support that plaintiffs seek to provide to foreign terrorist groups, §2339B does not violate the freedom of speech.

*Id*. at 39. While *Humanitarian Law Project* focused on speech and assembly challenges, there is no reason why its analysis should not apply equally to a challenge based on the Free Exercise clause of the First Amendment.

Under the Free Exercise Clause the government is prohibited from "plac[ing] a substantial burden on the observation of a central religious belief or practice" without first demonstrating that a "compelling governmental interest justifies the burden." *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989). In *Employment Division v. Smith*, 494 U.S. 872, 883 (1990) the Supreme Court held that

8

neutral laws of general applicability generally do not violate the Free Exercise clause even if those laws incidentally burden a religious practice. *Employment Division v. Smith*, 494 U.S. 872, 883 (1990); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993). In response to *Smith*, Congress enacted the Religious Freedom Restoration Act of 1993 ("RFRA"), 107 Stat. 1488, 42 U. S. C. §2000bb et seq., to reinstate the pre-*Smith* "substantial burden" test for laws of general applicability. Congress enacted RFRA "to provide very broad protection for religious liberty." *Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015) (*quoting Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014)). RFRA extends Free Exercise protection to persons whose religious beliefs are burdened by federal laws of general applicability. *Holt*, 135 S. Ct. at 860; *Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001) (holding that RFRA applies only to the federal government).[10] Although not necessary for a resolution of this matter, RFRA arguably, therefore, affords broader protection to religious exercise than the First Amendment. *Holt*, 135 S. Ct. at 860.

Under RFRA, "the federal government may not 'substantially burden' a person's religious exercise—even where the burden results from a religiously neutral, generally applicable law that is constitutionally valid under *Smith*—unless the imposition of such a burden is the least restrictive means to serve a compelling governmental interest." *Priests for Life v. United States HHS*, 772 F.3d 229, 236-237 (D.C. Cir. 2014); 42 U. S. C. §§2000bb-1(a), (b). The government ultimately bears the burden of demonstrating both its compelling interest and that the statute in question is

---

[10] Where the First Amendment's prohibition on governmental action that substantially burdens one's free exercise of religion extends to regulations that "significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; [ ] meaningfully curtail a person's ability to express adherence to his or her faith; or [ ] deny a person reasonable opportunity to engage in those activities that are fundamental to a person's religion," "RFRA extends free exercise rights even to religious practices that are not compelled by or central to a particular belief system." *Ali*, 682 F.3d at 709-710.

the least restrictive means of advancing that interest, as applied to the individual asserting RFRA as a defense. *Holt*, 135 S. Ct. at 860; *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 420 (2006) (noting that the government must meet its burden "to the person"—that is, as applied to the claimant asserting the defense). Accordingly, under RFRA, "a rule imposes a substantial burden on the free exercise of religion if it prohibits a practice that is both 'sincerely held' by and 'rooted in [the] religious belief[s]' of the party asserting the claim or defense." *United States v. Ali*, 682 F.3d 705, 710, (8th Cir. 2012) (citing *United States v. Zimmerman*, 514 F.3d 851, 853 (9th Cir. 2007)).

### III. ARGUMENT

Mr. Khan's mental state—a critical issue in this case—is most clearly evidenced in the farewell letter that he wrote to his parents. That letter clearly conveys Mr. Khan's deeply held religious beliefs, and the sense of obligation that he had to emigrate to an "Islamic state" that had been established. (Def. Exh. A). Mr. Khan uses the same phrase when he invites his parents to join him in the "Islamic state." The precise language that Mr. Khan chose is significant, as it evidences his intent simply to emigrate to the Caliphate, and not provide material support to ISIL. Mr. Khan wrote an "Islamic state" with a lowercase "state"—not "the Islamic State," much less ISIL or ISIS. Indeed, nowhere in his letter does he even mention ISIL, the foreign terrorist organization that the government alleges he left his country to assist, or to use the language of the statute, work under its direction or control. In contrast, Mr. Khan wrote that he sought only to live under Sharia law, not under ISIS's direction or control. He even explains his "motives" are to "take as much of [his] family to live in the land of Islam." Living in the land of Islam is a far cry from material support to a terrorist organization.

Mr. Khan's strong, but naïve, religious-based ideological disagreement with the West—as evidenced by his objection to paying taxes that, in his view, would be used to "automatically kill my Muslim brothers and sisters" as well as fear of raising a child in the immoral environment he perceived—are also protected First Amendment views. *See Texas v. Johnson*, 491 U.S. 397, 411 (1989) ("[E]xpression of dissatisfaction with the policies of the country [is] situated at the core of our First Amendment values."); *Elrod v. Burns*, 427 U.S. 347, 356 (1976) ("[P]olitical belief and association constitute the core of those activities protected by the First Amendment."); *Hill v. Colorado*, 530 U.S. 703, 787 (2000) (Kennedy, J., dissenting) ("Laws punishing speech which protests the lawfulness or morality of government's own policy are the essence of the tyrannical power the First Amendment guards against."). *Snyder v. Phelps*, 131 S.Ct. 1207, 1219 (2011) (quoting *Texas v. Johnson*, 491 U.S. at 414) ("[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). While they may also evince a lack of critical analysis, they certainly do not evidence an intent to join ISIS or work under its command and control to engage in violent jihad.

While it is easy to disagree with Mr. Khan's unpopular religious beliefs and label them misguided, simplistic, or even fundamentalist; it cannot be said that there were not sincerely held—and that is all that must be shown. *See United States v. Ballard*, 322 U.S. 78, 86-7 (1944). *Najafi v. INS*, 104 F.3d 943, 949 (7th Cir. 1997) ("Determination of a religious faith by a tribunal is fraught with complexity as true belief is not readily justiciable.") "[P]articularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether [an individual] … correctly perceived the commands of [his] faith. Courts are not arbiters of scriptural interpretation*.*" *Thomas v. Review Board*, 450 U.S. 707, 716 (1981). Mr. Khan "drew a line, and

it is not for [the courts] to say that the line he drew was an unreasonable one." *Id.* at 715.  Once an individual evidences faith-based determination, it does not matter whether the determination was "acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Id.* at 714.[11]

Regardless if he was "correct" in his views or whether his thinking evidences not even slightest amount of critical thinking, Mr. Khan genuinely believed that the only place where he could practice his religion was in the Caliphate.  Thus, by completely preventing him from emigrating to the Caliphate, the government's use of the material support statute substantially burdens Mr. Khan's exercise of religion.

Counsel have been unable to locate any post-*Humanitarian Law Project* decision that has considered issues similar to those presented here, specifically a challenge to a material support prosecution centered on the Free Exercise clause.  But even a cursory review of the cases that have dealt with the material support statute after *Humanitarian Law Project* illustrate that far more is required than what is present here.  *See*, *e.g.*, *United States v. Farhane*, 634 F.2d 127 (2d Cir. 2011) (physician who swore oath of allegiance to Al Qaeda and offered to "serve as an on-call doctor for the organization, standing ready to treat wounded mujahideen in Saudi Arabia"); *United States v. Augustin*, 661 F.3d 1105 (11th Cir. 2011) (actions that require no training can violate the material support prohibition if the individuals believe that they are working in concert with terrorists or terrorist organizations); *United States v. Shah*, 474 F. Supp. 2d 492, 498-99 (S.D.N.Y. 2007) (defendant "volunteered as a medic for the al Qaeda military" to treat wounded fighters); *United*

---

[11] Most any parent can attest to the oftentimes unacceptable, illogical, inconsistent or incomprehensible thought processes of teenagers—an issue that should not go unappreciated in this case.  Se also, Audrey Kurth Cronin, supra, footnote 1 ("In short, ISIS offers short-term primitive gratification.  It does not radicalize people in ways that can be countered by appeals to logic. *Teenagers are attracted to the group without even understanding what it is*…." (emphasis added))

*States v. Lindh*, 212 F. Supp. 2d 541, 549 (E.D. Va. 2002) (defendant enlisted in al Qaeda, received combat training, and served in an al Qaeda combat unit); *United States v. Mehanna*, 735 F.3d 32 (1st Cir. 2013) (traveling to Yemen and then preparing and disseminating a translation of pamphlet intended to incite people to violent jihad, where translations were a service provided to al Qaeda).[12] The facts involving Khan and his siblings pale by comparison those present in these cases.

If there is any consistency to the decisions involving material support prosecutions post *Humanitarian Law Project*, it is this: the decisions are remarkably uniform in adhering to the message in *Humanitarian Law Project* that the courts will not uphold convictions of individuals who are merely voicing opinions or otherwise exercising First Amendment rights. The cases maintain that it is never a violation to merely speak one's mind, and the courts closely hew to the language of 18 U.S.C. §2339B(i) that the material support provisions are not permitted to infringe upon the First Amendment and cannot apply to acts carried out by individuals who act independently. In other words, there is a nuanced line between constitutionally protected activities and proscribed activities. All of the cases above involved situations where that nuanced line was crossed. But this is not such a case. Thus, the indictment should be dismissed.

---

[12] *See also United States v. Chandia*, 395 F. App'x 53 (4th Cir. 2010) (defendant travelled to Pakistan and inquired about location of terrorist camps); *United States v. Mustafa*, 406 F. App'x 526 (2d Cir. 2011) (knowingly providing jihad training over the Internet is the provision of material support); *United States v. Al-Bahlul*, 2011 W.L. 49166373 (U.S. Ct. Mil. Comm'n Rev. Sept. 9, 2011) (travelling to Afghanistan and presenting one's self to Al Qaeda and undergoing military type training); *United States v. Goba*, 220 F. Supp. 2d 182, 193-94 (W.D.N.Y. 2002) (attending al Qaeda training camp was providing selves as personnel); *United States v. Marzook*, 383 F. Supp. 2d 1056, 1065 (N.D. Ill. 2005) (recruiting another to join Hamas and travel to Middle East to scout locations for potential attacks amounted to providing a recruit as personnel).

        Respectfully submitted,

        /s/ THOMAS ANTHONY DURKIN
        **THOMAS ANTHONY DURKIN,**

        /s/ CHRISTOPHER T. GROHMAN
        **CHRISTOPHER T. GROHMAN,**

        /s/ROBIN V. WATERS
        **ROBIN V. WATERS,**

        /s/ JOSHUA G. HERMAN
        **JOSHUA G. HERMAN,**
        Attorneys for Defendant.

**DURKIN ROBERTS & GROHMAN**
2446 North Clark Street
Chicago, IL 60614
(312) 913-9300
tdurkin@durkinroberts.com
cgrohman@durkinroberts.com
rwaters@durkinroberts.com

**LAW OFFICE OF JOSHUA G. HERMAN**
53 West Jackson Blvd., Suite 1650
Chicago, IL 60604
(312) 909-0434
jherman@joshhermanlaw.com

## **CERTIFICATE OF SERVICE**

       Thomas Anthony Durkin, Attorney at Law, hereby certifies that the foregoing Defendant's Errata Memorandum of Law in Support of His Motion to Dismiss the Indictment on First Amendment Grounds was served on April 17, 2015, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

                                                                         /s/ Thomas Anthony Durkin
                                                                        **THOMAS ANTHONY DURKIN**
                                                                         2446 N. Clark St.
                                                                         Chicago, IL 60614
                                                                         (312) 913-9300
                                                                         tdurkin@durkinroberts.com