UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | |
|---|---|
| v. | No. 14 CR 564 |
| MOHAMMED HAMZAH KHAN | Judge John J. Tharp Jr. |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY THE CONDITIONS OF PRETRIAL DETENTION**

The UNITED STATES OF AMERICA, through ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, respectfully submits its Response in Opposition to Defendant's Motion to Modify the Conditions of Pretrial Detention to Permit Release on Conditions so as to Permit Counseling.

## Introduction

Defendant, who has been described by his parents, counsel and psychiatric expert as brainwashed, "very immature," "impulsive," lacking "the capacity to scope out the consequences of his actions," and who attempted to abandon his parents, community and country for a barbaric terrorist group, asks this Court for pretrial release so he can develop "critical thinking skills." (Def. Mot. ¶ 9).[1] More specifically, defendant seeks release so he can receive "therapeutic services" from an unidentified counseling program with unknown credentials at an unidentified location so he can develop "critical thinking skills and appropriate perspectives and attitudes on being a Muslim male in American society." (Xenakis Rep. 5). At bottom,

---

[1] Defendant's Motion to Modify the Conditions of Pretrial Detention is cited as "Def. Mot." followed by the page number. Defendant's expert report of Dr. Stephen Xenakis is cited as "Xenakis Rep." followed by the page number.

defendant's motion seeks to litigate prosecutorial decision-making rather than the factors found in Title 18, United States Code, Section 3142.

**Background**

Defendant's motion does not contest the factual basis of the government's motion for detention or the findings of the Honorable Susan E. Cox from the first detention hearing. That factual basis and Judge Cox's findings are briefly summarized below.

On October 4, 2014, defendant attempted to execute a carefully calculated plan to take his high-school aged siblings halfway around the world to a warzone, where they would all join and offer themselves to the Islamic State of Iraq and the Levant ("ISIL"), in violation of Title 18, United States Code, Section 2339B(a)(1).[2] Before attempting to depart for Syria, defendant and his siblings left behind good-bye letters to their parents, other writings and drawings detailing their support for ISIL, ISIL's leader Abu Bakr al-Baghdadi, and ISIL's brutal violence. All of this, the planning, the writings and the attempt to leave were done while living in their parents' home, but, presumably, without their parents' knowledge or approval.

On November 3, 2014, Judge Cox held a detention hearing and found defendant to be a risk of flight and a danger to the community. (R. 32).[3] Judge Cox

---

[2] On or about May 15, 2014, the Secretary of State amended the designation of al-Qaeda in Iraq as an Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias "Islamic State of Iraq and the Levant" (ISIL) as its primary name. Abu Bakr al-Baghdadi is the current leader of ISIL. ISIL is also frequently referred to as ISIS or IS. On or about June 29, 2014, al-Baghdadi announced that he had established a caliphate and that ISIL would be referred to as the Islamic State.

[3] The Court's docket is referenced as "R." followed by the docket number.

found, "it's really the weight of the evidence of -- that overwhelmingly convinces me that Mr. Khan is a flight risk." (Tr. 70).[4] Judge Cox described the evidence as "clear" that defendant was prepared to abandon his family and as a result of the "compulsion of his beliefs," defendant "was willing to bring his minor siblings." (Tr. 71). Judge Cox also noted that defendant faces a significant penalty if convicted "[a]nd that to me only adds to his compulsion or impetus to go." (Tr. 71). Earlier during the pronouncement of the court's decision, Judge Cox noted, "the evidence that he was attempting to leave the United States of America to join an organization that our government has designated a terrorist organization . . ., the evidence that he was planning on doing that and providing it support is actually very strong." (Tr. 69).

Judge Cox also considered electronic monitoring, but found it inappropriate for defendant: "electronic monitoring is great, and I often impose it, but it's virtually ineffective if somebody really wants to leave and especially if the intent is to leave and not come back, which is what is expressed in the writings that have been introduced into evidence here today." (Tr. 71-72).

With respect to whether defendant was a danger to the community, Judge Cox noted that her finding was moot, but the government's argument for dangerousness is "a harder argument for me to accept." (Tr. 73). Judge Cox, however, added that:

---

[4] The transcript of the detention hearing held before Judge Cox on November 3, 2014, is referenced as "Tr." followed by the page number.

3

> But one thing really stands out to me when I -- and I had a lot of time to review the record in this case. . . .
>
> The writings that have been introduced into evidence show me that the defendant is not stable. He's not a stable person. This is not a person who is in control of his own actions, it doesn't seem to me, in some ways. I think he's -- I think you're right when you say he probably needs some sort of mental health treatment, and that's unfortunate.
>
> But here's the problem. Unstable people who have a firm and unshakable belief in their convictions -- and in this case, the conviction is, you know a call by a higher power to do something that potentially is quite dangerous to others around him -- that tips me, frankly narrowly. I mean, it's the issue I struggled over more than flight risk. To me flight risk is absolutely clear and uncontrovertible.

(Tr. 73-74).

On November 24, 2014, Judge Cox issued a written order. (R. 32). In the order, the Court held that that the government met its burden with respect to both risk of flight and dangerousness to the community. (*Id.*) Defendant did not appeal the detention order.

On April 17, 2015, defendant filed his Motion to Modify Conditions of Pretrial Detention. (R. 58).

## Legal Standard

Under Section 3142(f), a detention hearing may be reopened if a court determines "that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."

Even if reopening the hearing based on defendant's motion is proper, "it shall be presumed that no condition or combination of conditions will reasonably assure

4

the appearance [of defendant] as required and the safety of the community if the judicial officer finds that there is probable cause to believe that" defendant attempted to provide material support to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B(a)(1).[5] *See* 18 U.S.C. §§ 3142(e)(3)(C) and 2332b(g)(5)(B).

Pursuant to Section 3142(g), when determining whether there is a condition or combination of conditions that can assure the appearance of defendant and the safety of the community, a court shall consider the following four factors:

(1) the nature and circumstances of the offense charged, including among other things, whether the charge is a Federal crime of terrorism;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including a number of factors such as the person's mental condition; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

If defendant's motion overcomes the presumption, the government bears the burden of proving defendant is a danger to the community by clear and convincing evidence (*see* 18 U.S.C. §3142(f)) and proving defendant is a risk of flight by a preponderance of the evidence (*see United States v. Portes*, 786 F.2d 758, 765 (7th Cir. 1985) ("congressional silence" on burden "means acquiescence in the traditional preponderance of the evidence standard")).

---

[5] On January 8, 2015, a grand jury returned a single count indictment against defendant for attempting to provide material support to ISIL. (R. 37).

5

**Argument**

The substance of defendant's motion begins by recounting that "[t]o date, no mental health treatment has been provided Defendant" even though Judge Cox "indicated mental health treatment was warranted."[6] (Def. Mot. ¶ 3). Notwithstanding this complaint, defendant does not appear to seek traditional mental health treatment, but rather he seeks "critical thinking skills" therapy.

In support of his requested relief, defendant's motion eschews legal arguments and instead focuses on Executive Branch policies and decisions, concluding that defendant has "received no counseling, therapy, treatment or even a kind word" since his incarceration (Def. Mot. ¶¶ 4-7). Defendant also offers the opinions and recommendations of Dr. Stephen Xenakis. (Def. Mot. ¶¶ 8-9). Dr. Xenakis, without an explanation of his methodology, diagnosed defendant as not being "radicalized" and recommended that the government "should arrange to provide [defendant] intense educational, socializing, and therapeutic services to help him develop critical thinking skills and appropriate perspectives and attitudes on being a Muslim male in American society." (Xenakis Rep. 5). Finally, defendant concludes his motion by suggesting that this Court can follow the release conditions imposed on a defendant in a material support case in Minnesota. (Def. Mot. ¶ 10).

Neither defendant nor his expert identifies any program available to offer such critical thinking therapy. Defendant also fails to address whether he would be eligible for the unidentified program, how the program will be paid for, or why such

---

[6] Notably, defendant never made a request for any treatment (mental health or otherwise) to the government or this Court.

6

counseling cannot occur in custody as many forms of mental health treatment and counseling are provided. Similarly, defendant offers no analysis or context for the supervised release conditions imposed in the Minnesota case.

Defendant also does not address how Dr. Xenakis's conclusions overcome the presumption of pretrial detention or how they affect three of the four Section 3142(g) factors, for example:

(1) the nature and circumstances of the offense charged, including that defendant tried to take his minor siblings to a warzone to support a foreign terrorist organization, and as a result has been indicted with a Federal crime of terrorism (18 U.S.C. §3142(g)(1));

(2) the weight of the evidence against defendant, which was described by Judge Cox as "absolutely clear and uncontrovertible" (18 U.S.C. §3142(g)(2)); and

(3) the history and characteristics of the person, including that Judge Cox found defendant "unstable," and his own parents and/or defense team refer to him as brainwashed, "very immature," "impulsive," and lacking "the capacity to scope out the consequences of his actions" (18 U.S.C. § 3142(g)(3)).

Defendant's motion only references the fourth factor under Section 3142(g) by simply declaring that defendant is not radicalized and not dangerous. Defendant's motion rests on subjective *opinions* of Dr. Xenakis that cannot overcome the *facts* relied upon by Judge Cox to conclude that defendant poses a flight risk and presents a danger. Defendant's motion should be denied.

1. **Defendant's Philosophical Differences with the Executive Branch and His Desire for Admission to an Unidentified Counseling Program for "Critical Thinking Skills" Do Not Overcome the Presumption or the Evidence of Defendant's Risk of Flight or Dangerousness.**

While critical thinking skills counseling may benefit defendant, such counseling is not a basis for pretrial release, especially when defendant seeks counseling from an unidentified program. Neither defendant nor his expert identifies any programs appropriate for defendant. Rather, his expert recommends that "[t]he Government should arrange to provide [defendant] intense educational, socializing, and therapeutic services to help him develop critical thinking skills and appropriate perspectives and attitudes on being a Muslim male in American society." (Xenakis Rep. 5).

Putting aside whether the federal government should be in the business of subsidizing and supervising such religiously oriented "therapeutic services," helping defendant learn "appropriate perspectives and attitudes on being a Muslim male in American society" is not an issue properly before this Court through a motion to reopen a detention hearing under Section 3142.

Similarly, defendant's overwrought rhetoric about the Executive Branch is not relevant to pretrial release.[7] (*See* Def. Mot. ¶¶ 4-7). For example, defendant's motion contends that this is a case of "first impression in this District with respect to the government's wrong-headed national security policy of detaining and

---

[7] During the first detention hearing, after defense counsel expressed similar opposition to Executive Branch policies and actions, Judge Cox began the court's ruling by describing what issues were not before the Court: "The wisdom or otherwise of America's geopolitical foreign policy, the choices our country has made on those issues, that's not in front of me." (Tr. 67-68).

charging American citizens who fall prey to the slick and sophisticated social media religious rhetoric of ISIL on-line recruiters . . ..") (Def. Mot. ¶ 4). This, of course, is not an accurate description of the matter before this Court.

Defendant concludes his motion by suggesting that this Court can impose the conditions of release entered by Chief Judge Michael J. Davis of the United States District Court for the District of Minnesota in the case of *United States v. Abdullahi Mohamud Yusuf* (Case No. 0:15-cr-00046-MJD). Defendant then attaches the order entered by Chief Judge Davis. The order, however, provides few details regarding Yusuf's release or why the court found there were a combination of conditions that could reasonably assure the safety of the community and Yusuf's appearance. Defendant's motion provides no details regarding why Chief Judge Davis' decision would be persuasive to this Court's determination of whether pretrial release is appropriate for this defendant.

Defendant's desire for unidentified "therapeutic services," his criticisms of the government and his passing reference to Chief Judge Davis' order do not overcome Section 3142's presumption of detention or the government's proof of defendant's risk of flight or dangerousness to the community.

**2. Dr. Xenakis's Opinions and Recommendations Are Not Relevant to the Court's Determination, Have No Indicia of Reliability and Should Be Disregarded.**

To support defendant's argument that he is not a danger to the community and will not be a risk of flight if he receives "competent counseling," defendant offers the opinion of Dr. Stephen Xenakis, a psychiatrist and retired Army general.

At trial,[8] Federal Rule of Evidence 702 would bar opinion testimony like the conclusory style of Dr. Xenakis's report, which lacks methodology and analysis and relies on self-serving statements of a defendant. Rule 702 governs the admissibility of opinion testimony like that of Dr. Xenakis. *Smith v. Ford Motor Co.*, 215 F.3d 713, 717-18 (7th Cir. 2000). The proponent of Rule 702 testimony "bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

> Rule 702 provides for the admission of expert testimony if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied those principles and methods to the facts of the case.

Fed. R. Evid. 702

In *Smith*, the Seventh Circuit explained that "[i]n analyzing the reliability of proposed expert testimony, the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions." *Smith*, 215 F.3d at 718. The Seventh Circuit added that "[a] court's reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter. Even '[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions

---

[8] Although the Rules of Evidence do not apply during a detention hearing (*see* 18 U.S.C. § 3142(f)), Rule 702 provides a well-established framework for analyzing the relevancy and reliability of Dr. Xenakis' opinions.

are based upon some recognized scientific method.'" *Id.* (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 759 n. 5 (7th Cir.1999)).

The Seventh Circuit has "said over and over that an expert's *ipse dixit* is inadmissible." *Wendler & Ezra, P.C. v. AIG*, 521 F.3d 790, 791 (per curium) (citing *Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago,* 877 F.2d 1333, 1339 (7th Cir. 1989)). In *Mid-State*, the Seventh Circuit coined its oft-used phrase: "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Mid-State*, 521 F.3d at 1339.

There is no question that Dr. Xenakis has impressive credentials that would enable him to testify as an expert on a number of psychiatric and military issues. It, however, is unclear whether Dr. Xenakis has the appropriate credentials to offer some of his opinions, such as his criticisms of defendant's mosques, Dr. Xenakis's ability to diagnosis defendant's dangerousness, and Dr. Xenakis's ability to know defendant's intent (*e.g.*, that he merely desired the purported utopian and pious side of ISIL and not the genocidal ISIL).

The true failing of Dr. Xenakis's proposed testimony is the lack of reliability of his opinions. Dr. Xenakis's report offers nothing more than dozens of self-serving statements of defendant from which Dr. Xenakis bases his conclusions. He offers no insight into his methodology or any scientific analysis that he used in reaching his conclusions.

Dr. Xenakis provides no nexus between the limited evidence[9] that forms the basis of his opinions and his ultimate conclusions. For example, Dr. Xenakis concludes that that defendant "has not been 'radicalized.'" (Xenakis Rep. 5), but Dr. Xenakis does not provide any information about the methodology he used to reach such a diagnosis. He does not identify: any battery of tests or principles he used to reach such a conclusion; how he applied the facts of this case to those tests or principles; the extent those tests or principles are accepted in a psychiatric or medical community; or why they are appropriate to determine defendant's dangerousness.

Dr. Xenakis also does not offer any critical analysis of the data upon which he generated his opinions, such as limitations, contrary evidence[10] or alternative

---

[9] The documents reviewed by Dr. Xenakis were limited to certain exhibits from the first detention hearing. According to defense counsel, Dr. Xenakis reviewed five of the government's exhibits (copies of the siblings' letters to the their parents and a separate letter of Minor 1) and 17 of defendant's detention hearing exhibits, including: (1) eight news articles; (2) two of defendant's Facebook posts; (3) speeches of President Obama and Attorney General Eric Holder; (4) an interview with FBI Director James Comey; (5) a complaint from another material support prosecution; (6) abstracts from journal articles regarding adolescent development; (7) random documents evidencing defendant's prior status as a student at Benedictine University; and (8) an affidavit provided by a University of Chicago professor describing examples in Christianity of "the need for self-denial and sacrifice, and the necessity of suffering and, dying or being martyred for the true faith" among other things.

[10] For example, Dr. Xenakis does not address any of the writings or drawings recovered from defendant's home or car, including but not limited to: (1) drawings of armed jihadi fighters with captions that include "Come to Jihad" and "Come to Salvation"; (2) writing "Go to the battle, young men / Kill, kill, kill the infidels with our Jihad / The Islamic State in Iraq and the Levant;" (3) describing the leader of ISIL, Abu Bark al-Baghdad, as the Amir; (4) writing "Killing a Nusayri" (Nusayri is a pejorative term for Alawites who are part of Shia Islam); or (5) defendant's use of a *nom de guerre*. (Many of the writings were in Arabic and translations have been provided by FBI linguists fluent in Arabic ). Dr. Xenakis also does not address the use of defendant's phone to search phrases such as "jihad fard al ayn [jihad is obligatory]," "suicide bombings," and "suicide," among other topics. In addition, Dr. Xenakis does not address the online communications between defendant and Minor 1

analysis. Rather, Dr. Xenakis says that he conducted about seven hours of "standard psychiatric interviews," reviewed a limited number of documents, and was able to determine that defendant "has not been 'radicalized.'" Such a conclusion is improper expert testimony under Rule 702.

Based on his "standard psychiatric interviews" with defendant and minimal document review, Dr. Xenakis also was able to conclusively determine that defendant merely sought to be a part of the purported utopian[11] aspects of ISIL and not the genocidal and barbaric ISIL that ISIL goes to great lengths to promote:

> [Defendant] feels flooded by the social conditions and circumstances he confronted at college, and felt propelled to retreat into a[n] uncomplicated and regimented Muslim world to escape them.

---

with a cooperating defendant (who, at the time, also attempted to join ISIL) or a confidential human source posing as the cooperating defendant. Moreover, Dr. Xenakis does not address defendant's deception of his parents, his lies to Customs and Border Protection, or his incentive to lie to support his defense and his effort to be released from custody. In fact, Dr. Xenakis appears to have taken defendant at his word.

[11] Dr. Xenakis describes defendant's desire for a "utopian" caliphate that ISIL purportedly offered. Defendant and his siblings may have hoped through ISIL's horrific conquests of Shia Muslims, Yazidis, Kurds, Christians and others who stand in its way that ISIL would be able to develop a utopian society governed by Sharia law. On October 4, 2014, when defendant led his siblings in an attempt to get to Syria, they did not believe they were heading to a utopia. To the contrary, they knew they were headed to a warzone. They were ready for war as their letters and writings describe. Moreover, defendant was likely aware of many of the barbaric acts and atrocities committed by ISIL in the eight weeks leading up to his attempt to join ISIL, which garnered intense international media and social media coverage, such as: (1) capturing the Yazidi town of Sinjar and calling for the "systematic destruction of the entire Yezidi people" in early August, 2014 (Statement of the President of the United States, August 7, 2014); (2) beheading American journalist James Foley in mid-August 2014 (Carter, Chelsea J., "Video shows ISIS beheading U.S. journalist James Foley," CNN, August 20, 2014); (3) starting its effort to conquer the Turkish border town of Kobani (Narayan, Chandrika and Holly Han, "ISIS threat: Syrian town fears massacre; Obama admits underestimating rise," CNN, September 29, 2014); (4) encouraging Muslims around the world to kill U.S. citizens and westerners (Ross, Brian and Anthony Castellano, "New ISIS Recording Urges Muslims to Kill Civilians in US-Led Coalition Countries," ABC News, September 22, 2014); (5) beheading British aid worker Alan Henning and threatening American aid worker Peter Kassig (who they later beheaded) ("ISIS Releases Video Showing Beheading of Alan Henning," NBC News, October 3, 2014).

13

> Accordingly, he conjured that the idealistic and utopian caliphate advertised by ISIS propaganda offered him the setting to abide by his nascent convictions and reconcile the contradictions he encountered.

(Xenakis Rep. 4). Dr. Xenakis provides no ability to measure the reliability of his methodology. He just claims to know what defendant thought based on defendant's statements—and offers no reasons why defendant's statements are reliable.

Similarly, Dr. Xenakis has concluded that defendant: (1) "has not expressed or demonstrated violent or aggressive behavior;" and (2) "abhors fighting and violence towards others." These types of declaratives appear more like advocacy than psychiatric expertise. Regardless, without more, this type of testimony is not helpful and not proper under Rule 702.

Moreover, Dr. Xenakis's criticisms of defendant's education and the local mosques that defendant attended are not relevant, not proper for Rule 702 testimony, and should be limited at the detention hearing. For example, Dr. Xenakis concludes that: "Unfortunately, the practices and attitudes of the leadership at the local mosques precluded exploring his concerns and ideas with mentors or other respected authorities. He did not receive supportive intervention or guidance from other members of the Muslim community." (Xenakis Rep. 3). Dr. Xenakis provides no information about how he was able to determine the failings of defendant's mosques and the members of the local Muslim community (or his qualifications to reach such a conclusion). He offers no data he considered to reach that conclusion other than defendant's interviews and the limited number of documents he reviewed.

Unfortunately, this is not Dr. Xenakis's first attempt in a federal criminal case to stray from the role of an expert and to advocate on a defendant's behalf. In *United States v. Abu Ghayth*, 945 F. Supp. 2d 511, 518 (S.D.N.Y. 2013), the district court found Dr. Xenakis to be "obviously partisan and expressed opinions with little basis, relying predominately on second-hand accounts and theoretical possibilities."

Accordingly, Dr. Xenakis's proposed testimony should be disregarded.

**Conclusion**

Simply put, defendant's desire for "critical thinking skills" so he can develop "appropriate perspectives and attitudes on being a Muslim male in American society" is neither germane to pretrial release nor properly before this Court. To the extent defendant could benefit from long term counseling or therapy, that does not provide a basis for his release, given the compelling record in this case of his flight risk and dangerousness. Defendant's motion should be denied.

> Respectfully submitted,
> ZACHARY T. FARDON
> United States Attorney
>
> By: *s/ Matt Hiller*
> R. MATTHEW HILLER
> ANGEL M. KRULL
> SEAN K. DRISCOLL
> Assistant United States Attorneys
> 219 S. Dearborn Street
> Chicago, Illinois 60604
> (312) 697–4088