IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14 CR 564 |
| | ) | Judge John J. Tharp, Jr. |
| MOHAMMED HAMZAH KHAN, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant, **MOHAMMED HAMZAH KHAN**, by and through his attorneys, **THOMAS ANTHONY DURKIN** and **ROBIN V. WATERS**, pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, the opinions of the United States Supreme Court in *United States v. Booker,* 543 U.S. 220 (2005), *Rita v. United States,* 551 U.S. 338 (2007), *Gall v. United States,* 552 U.S. 38 (2007), *Kimbrough v. United States,* 552 U.S. 85 (2007), and *Nelson v. United States,* 555 U.S. 350 (2009), as well as 18 U.S.C. § 3553(a), respectfully submits Defendant's Sentencing Memorandum in support of counsel's request for a sentence that would permit Mr. Khan to enroll in college for the Fall semester of 2017.[1]

Needless to say, this is a difficult case, and difficult criminal cases are just that, difficult. And, as in every case, sentencing is always the most difficult issue. This is no different, though this case is, perhaps, made all the more difficult because of its uniqueness—especially the

---

[1] That sentence, assuming counsel's calculations for Bureau of Prisons ("BOP") good time credits are correct, is a sentence of 40 months, which would permit him to begin developing his sorely needed critical thinking skills. According to estimated calculations from the BOP, based upon Defendant's time in custody since his arrest on October 4, 2014, a sentence of 40 months would likely result in a release date of August 29, 2017. The College of DuPage where Defendant is most likely to seek enrollment begins classes on August 21, 2017. In that Defendant is likely to receive approximately three (3) months in a halfway house, it seems possible he could begin classes in a timely fashion. A sentence of 39 months would likely result in a release date of August 4, 2017, and would obviate the need for permission from the halfway house to attend the first classes.

emotionally charged atmospherics presented by the barbarousness of ISIS and the global terror threat it now presents. Whether, and to what extent, this threat was of such magnitude in the Fall of 2014 is but another question that need not necessarily be belabored for our present purposes.[2] However, this is not a mere fanciful question. According to a Brookings' Project Analysis Paper written by Princeton Ph.D. candidate in Near Eastern Studies, Cole Bunzel, prior to the U.S. bombing campaign in September of 2014, ISIS "had long prioritized the Middle East over the West—focusing on seizing and holding territory in its home theater then bringing down neighboring governments."[3] Apparently however, the U.S. air campaign altered the group's strategic calculus. As Bunzel points out, and as is also referenced in the government chart in its Sentencing Memorandum, it was not until September 21, 2014, that "Islamic State official spokesman Abu Muhammad al-'Alnani called on all supporters to kill Westerners arbitrarily throughout the world—Americans, Canadians, Australians, and their allies, both civilians and military personnel." *Id*. While this of course occurs shortly before Mr. Khan and his siblings Minors 1 and 2 attempted to take off for Syria, it lends credence to the concept that the Caliphate,

---

[2] However, see footnote 8, *infra*, regarding the antithetical tension created by bringing foreign policy issues into the area of domestic law enforcement. Whether ISIL is an "existential" threat to the U.S. was, and continues to be, a subject of considerable debate among international relations scholars and government experts. *See, e.g.*, Patrick J. Buchanan, *ISIS Poses No Existential Threat to America*, THE AMERICAN CONSERVATIVE, June 17, 2014, http://www.theamericanconservative.com/2014/06/17/isis-poses-no-existential-threat-to-america/; Mazzetti, Schmitt and Landler, *Struggling to Gauge ISIS Threat, Even as U.S. Prepares to Act*, NEW YORK TIMES, September 10, 2014, http://www.nytimes.com/2014/09/11/world/middleeast/struggling-to-gauge-isis-threat-even-as-us-prepares-to-act.html, ("Daniel Benjamin, who served as the State Department's top counterterrorism advisor…said the public discussion about the ISIS threat has been a 'farce,' with 'members of the cabinet and top military officers all over the place describing the threat in lurid terms that are not justified."); Ramzy Mardini, *The Islamic State threat is overstated*, WASHINGTON POST, September 12, 2014, https://www.washingtonpost.com/opinions/the-islamic-state-threat-is-overstated/2014/09/12/acbbebb2-33ad-11e4-8f02-03c644b2d7d0_story.html, ("…the Islamic State's fundamentals are weak, and it does not have a sustainable endgame. In short, we're giving it too much credit."). Needless to say, however, no one is minimizing the terrible threat ISIS now poses globally regardless of whether they are an existential threat or not, even today. And, no one is more grateful than Hamzah's parents for the FBI's intervention than they for saving the lives of their children.

[3] *See* Cole Bunzel, *From Paper State to Caliphate: The Ideology of the Islamic State,* The Brookings Project On U.S. Relations with the Islamic World, Analysis Paper No. 19, March 2015. Bunzel's paper also provides a lucid history of the development of the Islamic State and provides significant insight to the complexities of the fight in which we are now deeply entangled.

2

as opposed to violent jihad, was the driving force behind the trip. Again, this is not to excuse, but only to explain.

Nonetheless, and regardless of Middle Eastern Islamic politics, a foolish and extremely dangerous plot instigated by radical foreign terrorist online recruiters, hatched by cloistered or "cocooned" young American Muslim children[4] sorely lacking in emotional maturity, sophistication, and critical thinking skills, presents itself in a federal criminal court. Not being able to discern ISIS' asinine utopian recruitment promises of a life far more exciting and purposeful than anything in Bolingbrook, Illinois, Hamzah Khan now finds himself a convicted felon having already spent over two years in jail, and facing the possibility of more incarceration and stringent, invasive Supervised Release conditions that will follow him into his middle age. Thus, the difficulty presented by this sentencing is the quandary of trying to fashion a sentence under § 3553(a) that is "sufficient but not greater than necessary" to comply with the multiple goals of federal sentencing set forth in § 3553(a)(2).

Fortunately, and much to their credit, the prosecutors realize the complexity of this extraordinarily unique case, and have agreed to recommend a relatively reasonable sentence of sixty (60) months, at least insofar as most "terrorism" cases are concerned.[5] Equally to the point of the government's reasonableness, the plea agreement also permits Defendant to seek an even lower sentence, which counsel do by asking instead for the forty (40) month sentence that would

---

[4] *See*, Janet Reitman, *The Children of ISIS*, ROLLING STONE, March 25, 2015 ("The problem with this [parenting] approach, notes Ahmed Rehab, executive director of the Chicago branch of the Council on American Islamic Relations, is by 'cocooning' one's children in Islamic schools, parents run the risk of setting them up for profound isolation. When they emerge, he asks, 'will the kids be prepared for what they see?'").

[5] Without the terrorism enhancement, however, Mr. Khan's total offense level would be a level 25, which when combined with a criminal history category I, would result in an advisory guidelines range of 57 – 71 months' imprisonment. As is clear from the plea agreement, each party obviously agrees that the terrorism enhancement, U.S.S.G. § 3A1.4, considerably overstates both the seriousness of the offense and Mr. Khan's criminal history. Nor is this to say in any fashion that a sixty (60) month or forty (40) month sentence for a nineteen year-old first offender is a light sentence.

permit Mr. Khan to enroll in college for the Fall semester of 2017. Counsel submit such a sentence is one that makes the most sense when everything is taken into account. In fact, it is submitted, that such a sentence is virtually imperative in order for Mr. Khan to comply with the stringent conditions of the lengthy period of Supervised Release with which he has already agreed to comply in the plea agreement.

The plea agreement—again thanks to the reasonableness of the prosecutors—while providing unusually strict and invasive monitoring of Defendant, also provides the much needed assistance Defendant needs and, unfortunately, has not been provided during his pretrial detention. For example, upon his release and at Probation's direction, Defendant shall participate in a mental health treatment program, which may include the use of prescription medication. (PSR, p. 17, ¶ 9) Defendant will also be obligated to participate in an approved job skills training program unless he is registered as a full-time student pursuant a degree. (Dkt. #95, Ex. A, p. 3) Likewise, Mr. Khan must attend violent extremism counseling from providers directed by Probation. (Dkt. #95, Ex. A, p. 4)

This is exactly the kind of assistance defense counsel had sought for Mr. Khan in its pleading captioned "Defendant's Motion to Modify the Conditions or Pretrial Detention to Permit Release on Conditions so as to Permit Counseling," filed on April 17, 2015. (Dkt. #58) A copy of said motion without its voluminous attachments is attached hereto as Ex. A, and incorporated by reference. While the motion was not litigated due to Defendant's agreement to cooperate,[6] several of its points remain salient in relation to sentencing and it is worthy of a second read.

First and foremost, it cannot be overstated that Mr. Khan has not received any counseling in the form of mental health treatment or countering violent extremism ("CVE") treatment since

---

[6] *See* Dkt. #71 (Order granting government's agreed motion to stay briefing schedule).

4

the date of his arrest in the Fall of 2014. Nor is it likely any such counseling will be available in the Bureau of Prisons.[7]

Second, whether Mr. Khan gets out of custody today, at the end of a forty (40) month sentence, or at the end of the sixty (60) month sentence recommended by the government, Mr. Khan will still require "intense education training and therapy" to protect him from recruitment or radicalization, as recommended by Stephen N. Xenakis, M.D., the board certified psychiatrist from Arlington, Virginia, who conducted a clinical evaluation and psychiatric interview of Defendant at the Jerome Combs Detention Center in Kankakee on March 18-19, 2015. Counsel set forth a summary of Dr. Xenakis' findings in the Defendant's bond motion. (*See* Dkt. #58, pp. 5-6) At the Court's direction (Dkt. #65) a written disclosure of his expert opinion was provided to the government on April 27, 2015. A copy of Dr. Xenakis' written opinion and findings is attached hereto as Ex. B and incorporated herein.

Like the bail motion, Dr. Xenakis' report is equally deserving of a second read as it, too, is as poignant today as it was then. In fact, many of Dr. Xenakis' findings as to Mr. Khan's lack of present dangerousness ring similar to those set forth in the prosecutor's sentencing memorandum. Dr. Xenakis' findings as to the underlying psychological motivations that lead Mr. Khan into this mess, also echo the conclusions of both Probation and the prosecutors. That is, as Dr. Xenakis stated:

---

[7] A lengthy period of imprisonment at an institution more severe than the MCC or Jerome Combs Detention Center in Kankakee, even for the sixty (60) months the government recommends could very well have the reverse effect with respect to recidivism. That is, a long period of imprisonment may increase instead of decrease the likelihood of recidivism. This is all the more true based on the fact that, in undersigned counsel's experience, many defendants serving time for terrorism-related offenses end up together in Communications Management Units "CMU" facilities where the risk for radicalization and exposure to more serious offenders only increases. *See*, *Statement of Chairman Peter T. King (R-NY) Committee on Homeland Security*, "Threat of Muslim-American Radicalization in U.S. Prisons," June 15, 2011 ("The Obama Administration recognizes prison radicalization is a serious threat and that prisons are fertile ground for recruitment."); Noemie Bisserbe, *European Prisons Fueling Spread of Islamic Radicalism*, THE WALL STREET JOURNAL, July 31, 2016.

> Hamzah decided to resolve the tension and contradictions of his social situation and developmental challenges by subscribing to an unrealistic and simplistic vision of a utopian caliphate. He lacked the social network and relationships with supportive adults to work through the contradictions and questions he faced. His actions have long been recognized as not uncommon, but often ineffective, resolutions by adolescents who leave home and, in some cases, join cults.

(Xenakis Report, p. 5)

Finally, and directly to the point of counsel's recommendation that the Court fashion a sentence so as to permit Mr. Khan to return to college in the Fall of 2017, is the repeated reference in Dr. Xenakis' report to Defendant's lack of critical thinking skills. While Dr. Xenakis—like the prosecutors and Probation—recommends mental health treatment and violent extremism counseling, nothing can better provide one with critical thinking skills than a college education, especially as compared to the alternative of a prison cell. And, like it or not, if Mr. Khan does not obtain critical thinking skills, he will be back before this Court. Those who have had contact with Mr. Khan, including his parents, undersigned counsel, and Dr. Xenakis, agree there is reason to believe that Mr. Khan—having been provided with nothing but time to think—is very receptive to making the changes not only to his critical thinking skills, but also to his entire young life.

Nor should any of these comments ignore consideration of the deterrent effect of a sentence as the Court is required to consider under § 3553(a)(2). Attempting to provide material support by providing personnel in the form of one's own body to a designated foreign terrorist organization, which has now become the scourge of the earth to Western civilization, is certainly serious; and a very serious problem for U.S. national security purposes. It has also now become a problem for domestic law enforcement. But the nature of this problem, and how to resolve it, depends upon whether one views the issue from a national security standpoint or from a domestic

law enforcement standpoint.[8] It is an alarming, yet not unprecedented historical phenomena that an American citizen would choose to leave his country to join a foreign civil war.[9] Nor is terrorism limited only to post 9/11 America, and fundamentalist Islamic groups.[10]

However, the circumstances of Defendant's admitted conduct and how he came to commit this offense provides needed social and political context that—while not excusing the conduct—both mitigates and explains this behavior. In particular, the recruitment of Mr. Khan and his minor siblings by savvy ISIL recruiters using persuasive propaganda on social media to capitalize on their susceptibility to this messaging, played a very significant role in the commission of this offense. Moreover, as set forth in detail below and as acknowledged in the government's sentencing memorandum,[11] the sympathy of the Khans for the Syrian children massacred by Assad's regime, their religious motivations to make *hijrah* to ISIL's self-proclaimed caliphate,[12] their perceived opportunity to participate in the creation of the so-called utopian Islamic society,

---

[8] Counsel would submit that the foreign policy issue regarding the serious danger of ISIS on a global scale and the domestic policy issues concerning ISIS recruitment or brainwashing of susceptible American youth are antithetical to one another. But, counsel would daresay that this is a byproduct of the attempt to shoehorn foreign policy matters into domestic criminal prosecutions. *See, e.g.*, Thomas Anthony Durkin, *Permanent States of Exception: A Two-Tiered System of Criminal Justice Courtesy of the Double Government Wars on Crime, Drugs & Terror*, Val. U. L. Rev., Vol. 50, No. 2 (2016). Without elaborating a far more complicated topic, or attempting to minimize Defendant's conduct, this too, is the consequence of the political decision after 9/11 to treat terrorism on the "war" model versus the "criminal" model. *See, e.g.*, James B. Steinberg and Miriam R. Estrin, *Harmonizing Policy and Principle: A Hybrid Model for Counterterrorism*, 7 J. Nat'l Security L. & Pol'y 161.
[9] *See*, Joshua E. Keating, *Is It Legal for Americans to Fight in Another Country's Army?* FOREIGN POLICY, September 2, 2011 ("The U.S. government certainly doesn't encourage citizens to go off and fight in foreign wars, but there's a long history of it—from the Abraham Lincoln Brigade that fought against Francisco Franco during the Spanish Civil War to the many Jewish Americans who have served in the Israel Defense Forces."). The famous French Foreign Legion also comes to mind.
[10] Daniel Deudney, *Omniviolence, Arms Control, and Limited Government,* THE LIMITS OF CONSTITUTIONAL DEMOCRACY, Princeton University Press (2010) ("The recent focus on violent fundamentalist Islamic groups operating in many parts of the world has been appropriate but should not obscure the fact that the world is filled with other groups with revolutionary, if not apocalyptic, goals…. Terrorism in something like its current form has been around for at least a century.") ch. 15, p. 311.
[11] *See*, Govt. Sent. Memo, Dkt. #95, p. 2 ("[Khan] explained how [recruiters] influenced his transition from a student empathetic to the plight of the victims of the Assad regime to supporting [ISIL]"); *see also*, p. 8 ("[T]he genesis of Khan's interest in the conflict of Syria appears to have initially focused on the plight of the Syrian people under attack by the Assad regime.").
[12] *Hijra* refers to the Islamic teaching of mandatory emigration to the caliphate. *Encyclopedia Britannica* https://www.britannica.com/event/Hijrah-Islam.

and their search for belonging and identity each played a crucial role. *See, Case by Case: ISIS Prosecutions in the United States*, Center On National Security at Fordham Law, March 1, 2014 – June 30, 2016, http://news.fordham.edu/law/center-on-national-security-releases-report-on-isis-prosecutions/ ("Overall, there is a sense of identity crises and alienation from society across the wide range of [ISIS] cases."). [13]

As set forth in the PSR, in February of 2014, an eighteen (18) year-old Mr. Khan and his sibling, Minor 1, then sixteen (16) years-old, secured introductions to ISIL members in Syria. (PSR, p. 5, ¶ 9) However, the online recruitment of the Khan children by ISIL recruiters began well before 2014. Almost two years earlier, when Minor 1 was a mere fourteen years old, Minor 1 developed an interest in the humanitarian crisis in Syria by viewing articles on Facebook. Minor 1 was eventually contacted by a Facebook user who claimed to be a male ISIL supporter based in Syria working with an aid group to provide humanitarian relief to Assad's victims. Playing on the compassion and empathy of this child, the Facebook user encouraged Minor 1 to come to Syria to support the ISIL cause. Eventually, Minor 1's contact with ISIS recruiters increased and intensified, and Minor 1 put Mr. Khan in communication via social media with the recruiters and sympathizers. (PSR, p. 5, ¶9)

ISIS' powerful ability to recruit American youth on social media is by now a well-documented phenomenon. *See, e.g*., Lorenzo Vidino and Seamus Hughes, *ISIS in America: From Retweets to Raqqa*, Program on Extremism, The George Washington University (December 2015) ("U.S. authorities estimate that several thousand Americans consume ISIS propaganda online creating what has been described as a 'radicalization echo chamber.'"); Testimony of James B.

---

[13] *See also,* Defendant's Detention Hearing Ex. #18 (collecting abstracts of articles regarding adolescent behavioral psychology and juvenile offenders). However, anyone having raised teenagers does not need to consult scholarly texts to comprehend the identity issues teenagers often struggle and act out over.

Comey, Director, Federal Bureau of Investigation (FBI), Senate Select Committee on Intelligence, *Counterterrorism, Counterintelligence, and the Challenges of "Going Dark,"* July 8, 2015 ("Social media has allowed groups, such as ISIL, to use the Internet to spot and assess potential recruits. With the widespread horizontal distribution of social media, terrorists can identify vulnerable individuals of all ages in the United States—spot, assess, recruit, and radicalize—either to travel or to conduct a homeland attack.");[14] *see also,* Defendant's Detention Hearing Ex. #17, (ISIS' ultra-slick online magazine *Dabiq*).

Though Mr. Khan ultimately made his own choice to travel overseas, and is in no way blaming his siblings or anyone else, the recruiters' preying upon his immature and simplistic religious beliefs cannot go unmentioned or underappreciated.[15] Indeed, the influence of ISIS' recruitment is evident in Mr. Khan's three-page goodbye letter to his parents,[16] where he repeats the stupidly simplistic, naïve, and dogmatic messaging spewed by the religiously fundamentalist ISIS propagandists:

---

[14] There is no evidence whatsoever to indicate that Mr. Khan ever intended to commit a violent act of any kind in the United States. Counsel submit that due consideration of this factor is critical, for it distinguishes Mr. Khan many from other defendants charged under § 2339B who have received harsh sentences under the guidelines.

[15] See Ex. B, p. 3. Dr. Xenakis concluded that Hamzah has "fanciful, simplistic, and immature perceptions about himself and the world at large." "Hamzah demonstrates limited understanding of Islam… By his own admission, he memorized the *Koran* while attending a small private school but has limited fluency or understanding of Arabic." On the same page, Dr. Xenakis goes on to comment that "[d]espite simplistic explanations of Muslim theology he does not express vehement or so-called 'radical' thinking on jihad." Simplistic radical thinking based upon religious fanaticism is not, however, limited only to Islam. *See* Defendant's Detention Hearing Ex. 1, *Affidavit of Professor Susan Schreiner*, November 2, 2014 ("With regard to the themes of repentance, suffering, sacrifice, the devil and martyrdom, the reader need to look no further than the Bible… the theme of suffering persecution and death for the true faith was not limited to the early Christians.") Professor Schreiner traces this theme through the 10th century Cluniac monk Adso of Montier-en-der, to Martin Luther, Thomas Müntzer, Second Great Awakening evangelists such as Charles Finney—who coined the term "the burned-over district" of central and Western New York—through Dietrich Bonhoeffer and the Confessing Church of Germany during World War II.

[16] Khan's parents also made their feelings regarding the online recruitment of their children known when Mr. Khan's mother Zarine Khan made an emotional statement to the press after her son's arraignment, stating: "We condemn the brutal tactics of ISIS and groups like them. And we condemn the brainwashing and the recruiting of children through the use of social media and the internet. And we have a message for ISIS, [ISIS leader] Mr. Baghdadi, and his fellow social media recruiters: Leave our children alone!" Jason Meisner, *Terror suspect's parents tell ISIS: 'Leave our children alone*,' CHICAGO TRIBUNE, January 14, 2015.

> First, I am considered an adult and will be obliged to pay taxes to the government. This in turn would be used automatically to kill my Muslim brothers and sisters…. Secondly, an Islamic state has been established and it is thus obligatory upon every able bodied male and female to migrate there. I cannot live under a law in which I'm afraid to speak my beliefs…. Thirdly, I do not want my progeny to be raised in a filthy environment like this. We are all witness that the Western societies are getting more immoral day by day.

(Govt. Detention Hearing Ex. 4)

Such high minded purpose has been identified as a common factor among ISIL recruits, and is certainly in keeping with teenagers seeking a more meaningful solution to their identity problems. As noted by Lorenzo Vidino and Seamus HIghes, "In many cases examined by our research team [the Program on Extremism at George Washington University], an underlying sense of sympathy and compassion appeared to play an important role in initially motivating young Americans to become interested and invested in the Syrian conflict." *ISIS in America: From Retweets to Raqqa*, THE GEORGE WASHINGTON UNIVERSITY (2015) p. 15. *See also*, Testimony of Peter Bergen, Director, International Security Program, New America and Profession of Practice at Arizona State University, U.S. Senate Committee on Homeland Security and Governmental Affairs, *Jihad 2.0: Social Media in the Next Evolution of Terrorist Recruitment*, May 7, 2015 ("In the minds of ISIS' recruits, the group is doing something that is of *cosmic importance* that is sanctioned by Allah: defending Sunni Muslim civilians from the terrible onslaughts of the Assad regime, which has not hesitated to use chemical weapons in its war against its own people.")(emphasis in original). In his interview with the probation officer, Mr. Khan's father, Shafi Khan, echoed this sentiment, noting that his son likely wanted to assist suffering persons in the Middle East but chose the wrong way to do so. (PSR, p. 11, ¶ 53)

It is in this confusing social context that—not unlike many children of first generation Americans—Mr. Khan has struggled to find his own identity. He was raised with his parents'

traditional value system, yet lived his entire life in this country, embracing many Western practices and values. The vexing social and political implications of cultural assimilation by immigrants is a topic too unwieldy for this pleading, but should not go without mention—for it provides valuable context to Mr. Khan's life and conduct.[17]

Finally, it should not go unmentioned that, at the time of his arrest, Mr. Khan was only nineteen (19) years-old and that this was a process of indoctrination that began when he, too, was a minor. While Khan was not legally a minor at the time of the flight to Istanbul, this factor should weigh heavily in his favor. In *Miller*, the Supreme Court articulately delineated several of the important differences between juvenile and adult offenders, which is quite poignant to this discussion:

> [C]hildren are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, [] they are less deserving of the most severe punishments… First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to a recklessness, impulsivity, and heedless risk-taking. Second, children are more vulnerable to negative influences and outside pressures including from their family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as well formed as an adults'; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity.

*Miller v. Alabama*, 132 S. Ct. 2455, 2464 (2012)(internal quotations omitted)(holding mandatory life imprisonment without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishment).

Counsel submit that these important considerations apply in equal force to a young Mr. Khan, who with insufficient critical thinking skills was extremely vulnerable to the negative and ubiquitous influence of social media. Compounding that negative influence, Mr. Khan's restrictive

---

[17] *See generally*, Samuel P. Huntington, *Who Are We? The Challenges to America's National Identity*, Simon & Schuster (2014); Noel Ignatiev, *How the Irish Became White*, Routledge (2008).

cultural environment likely exacerbated the problem. Even more to the point, the treatment and education urged by counsel strike at the very core of the Supreme Court's reasoning in *Miller*; that is, Mr. Khan's ideas are less fixed at a young age than an older adult—and he is therefore far more likely to be able to be reformed with treatment, education, and therapy as a consequence.

Furthermore, and equally to the point, this approach is consistent with President Obama's pledge to "offer an alternative vision" to the American youth who have fallen prey to ISIS' social media propaganda machine.[18] That is, counsel strongly suggest that this Court consider the overwhelming need for Mr. Khan's sentence to reflect a coherent, effective response to the very real practical problem of American children attempting to join ISIS that is consistent with the CVE positions articulated by the federal government including the White House and Department of Justice.

In August 2011, President Obama singed the *National Strategy for Empowering Local Partners to prevent Violent Extremism in the United States* ("National Strategy"), which outlines a community-based approach to preventing violent extremists from inspiring, radicalizing and recruiting individuals in the United States.[19] The National Strategy includes the provision that the government strive to use a wide range of good governance programs including those that provide "social services" to prevent and address radicalization. *Id.* at 8. A few months later, in December of 2011, the White House released its *Strategic Implementation Plan for Empowering Local*

---

[18] Remarks by President Obama in Address to the United Nations, UN General, September 24, 2014, https://www.whitehouse.gov/the-press-office/2014/09/24/remarks-president-obama-address-united-nations-general-assembly.

[19] Office of the President of the United States, *Empowering Local Partners to Prevent Violent Extremism in the United States*, August 2011, https://www.whitehouse.gov/sites/default/files/empowering_local_partners.pdf ("Communities are best placed to recognize and confront the threat [of radical ideology] because violent extremists are targeting their children, families, and neighbors. Rather than blame particular communities, it is essential that we find ways to help them protect themselves. To do so, we must continue to ensure that all Americans understand that they are an essential part of our civic life and partners in our efforts to combat violent extremist ideologies and organizations that seek to weaken our society.").

*Partners to Prevent Violent Extremism in the United States* ("Strategic Implementation Plan"), in an effort to form a coherent method to implement the National Strategy.[20] The Strategic Implementation Plan identifies three priority areas of action: (1) enhancing Federal engagement with and support to local communities that may be targeted by violent extremists;[21] (2) building government and law enforcement expertise for preventing violent extremism; and (3) countering violent extremism propaganda while promoting our ideals. *Id*. The Strategic Implementation Plan tasks various federal agencies including the Department of Homeland Security, the Department of Justice, the Federal Bureau of Investigation, the State Department, and others with executing various CVE policies and programs.

On September 15, 2014—nineteen (19) days prior to Mr. Khan's arrest—former Attorney General Eric Holder announced the DOJ's *Pilot Program to Counter Violent Extremists (*"DOJ Pilot Program").[22] In announcing the DOJ Pilot Program, Holder stated that the program seeks to "bring together community representatives, public safety officials, religious leaders, and United States Attorneys to improve local engagement; counter violent extremism; and—ultimately—to build a broad network of community partnerships to keep our nation safe." *Id*. Programs were subsequently launched in Boston, Los Angeles and Minneapolis.[23]

---

[20] Office of the President of the United States, *Strategic Implementation Plan for Empowering Local Partners to Prevent Violent Extremism in the United States*, December 2011, https://www.whitehouse.gov/sites/default/files/sip-final.pdf

[21] The government's effort to enhance community outreach is not uncontroversial. The directive been criticized as a vehicle to exploit the communities for intelligence purposes. *See, Countering Violent Extremism (CVE): A Resource Page*, BRENNAN CENTER FOR JUSTICE, October 5, 2016, https://www.brennancenter.org/analysis/cve-programs-resource-page (collecting articles regarding the exploitation of community outreach for intelligence purposes).

[22] Department of Justice, *Attorney General Holder Announces Pilot Program to Counter Violent Extremists*, September 15, 2014, https://www.justice.gov/opa/pr/attorney-general-holder-announces-pilot-program-counter-violent-extremists

[23] *See*, US Attorney's Office, District of Massachusetts, *A Framework for Prevention and Intervention Strategies*, February 2015, https://www.justice.gov/sites/default/files/usao-ma/pages/attachments/2015/02/18/framework.pdf (developed by a collaborative of non-governmental and governmental stakeholders from the Greater Boston region); *The Los Angeles Framework for Countering Violent Extremism*, February 2015, https://www.dhs.gov/sites/default/files/publications/Los%20Angeles%20Framework%20for%20CVE-

A few days later, on September 24, 2014, President Obama gave his speech at the United Nations imploring the international community to steps to "contest the space that terrorists occupy, including the Internet and social media," noting that ISIL "propaganda" "has coerced young people to travel abroad to fight their wars, and turned students—young people full of potential—into suicide bombers. We must offer an alternative vision."[24]

To that end, in February of 2015, President Obama held *The White House Summit on Countering Violent Extremism*, which announced new steps to advance CVE efforts including appointing a full-time CVE Coordinator at the Department of Homeland Security, seeking additional funding to support DOJ CVE efforts, and establishing various domestic and international collaborative partnerships.[25] Later that same year, in September of 2015, the President again hosted a White House event focused on CVE—the *Leader's Summit on Countering ISIL and Violent Extremism.*[26] That same month, the Department of Justice launched another initiative focused on the CVE, the *Strong Cities Network to Strengthen Community Resilience Against Violent Extremism.*[27] A sentence which would allow Mr. Khan to both attain CVE treatment and further his education would appear to counsel to comport with the National Strategy and the ongoing efforts of the federal government to address this issue.

For all the reasons set forth above, counsel would implore the Court to fashion a sentence that is tempered with mercy, which would further demonstrate to Mr. Khan that this a country that believes in fairness and redemption. His is a life well worth saving, and Mr. Khan needs

---

Full%20Report.pdf (developed by the Los Angeles Interagency Coordination Group in Collaboration with Community Stakeholders); *Building Community Resilience, Minneapolis-St. Paul Pilot Program, A Community-Led Local Framework*, February 2015, https://www.justice.gov/usao-mn/file/642121/download.

[24] *See* footnote 18, *supra*.

[25] https://www.whitehouse.gov/the-press-office/2015/02/18/fact-sheet-white-house-summit-countering-violent-extremism

[26] https://www.whitehouse.gov/the-press-office/2015/09/29/leaders-summit-countering-isil-and-violent-extremism

[27] https://www.justice.gov/opa/pr/launch-strong-cities-network-strengthen-community-resilience-against-violent-extremism

desperately to start college next Fall if he is to succeed. A year in college versus a year in prison is what hangs in the balance. It is the right thing to do.

                                        Respectfully submitted,

                                        /s/Thomas Anthony Durkin
                                        **THOMAS ANTHONY DURKIN,**

                                        /s/Robin V. Waters
                                        **ROBIN V. WATERS,**
                                        Attorneys for Defendant.

**DURKIN & ROBERTS**
2446 North Clark
Chicago, Illinois 60614
(312) 913-9300
tdurkin@durkinroberts.com
rwaters@durkinroberts.com

## **CERTIFICATE OF SERVICE**

      Thomas Anthony Durkin, Attorney at Law, hereby certifies that the foregoing Defendant's Sentencing Memorandum was served on November 7, 2016, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

                                                            /s/ Thomas Anthony Durkin
                                                            **THOMAS ANTHONY DURKIN,**
                                                            Attorney at Law.

**DURKIN & ROBERTS**
2446 N. Clark Street
Chicago, IL 60614
(312) 913-9300
tdurkin@durkinroberts.com